(C. D. 1861)

F. B. VANDEGRIFT & Co., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 21, 1957)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Mollie Strum, Joseph E. Weil*, and *Murray Sklaroff*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise here involved (plaintiff's exhibit 9) was invoiced as "MANGANESE DIOXIDE (Manganese Ore Washed Ground Battery Manganese No. 2)." During the trial of the case, the materials were referred to by the plaintiff's witnesses and counsel as manganese dioxide ore and activated manganese ore. It is admitted by both parties that the product is not manganese salt. An analysis of a sample of the merchandise by Government chemists showed it to contain 52.68 per centum "metallic manganese" (R. 27). Upon arrival in the United States, the imported material was not further processed by the importer, but was sent directly to certain manufacturers of dry cell batteries. The involved product was classified by the collector as a manganese compound, dutiable under the provisions of paragraph 50 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, at 20 per centum ad valorem. It is contended by the plaintiff that the product now before us should be classified under paragraph 302 (a) of said tariff act, as modified by T. D. 51802, at the rate of one-fourth of 1 cent per pound on the metallic manganese content, or, in the alternative, under paragraph 214 of the Tariff Act of 1930, as modified by T. D. 51802, at 15 per centum ad valorem, as "Earthy or mineral substances * * * not decorated." The latter claim was likewise advanced by the defendant, without, however, abandoning, in any way, the collector's classification.

It is not disputed that, as set forth in the deposition of one J. Jacobi of London, a chemical engineer, who managed the plant of the exporter in England, certain manganese ore mined on the Gold Coast of Africa was transported to England where, in the words of Mr. Jacobi's deposition, it was processed in the following manner:

The ore is crushed and ground by a series of conventional operations to such a fineness that 80 per cent of the ore passes through a 200 mesh screen. During these operations some drying and removal of magnetic impurities is also carried out. The ore is then calcined at dull red heat so as to render the undesirable manganese compounds and most of the other impurities soluble in dilute mineral acid. After calcination, the ore is cooled under reducing conditions, which ensures that the impurities remain soluble. The calcined ore is subsequently treated with hot dilute sulphuric acid to remove the soluble compounds of manganese and impurities in the ore. The solid ore residue, which contains all the desirable manganese oxides, is filtered to separate it from the liquor which contains the dissolved portion of the ore and thoroughly washed. The washed filter cake is dried, pulverised [sic] and suitably packed into sacks. [Answer to direct interrogatory 29, plaintiff's exhibits 1 and 1-A.]

In answer to defendant's cross-interrogatories, Mr. Jacobi testified as follows:

[2.] Q. Please state the percentages of impurities that are present, as well as the percentages of the various manganese compounds that constitute the ore

used.—A. I am speaking from memory and the percentages vary, but I will attempt to set down what may be a typical analysis of a consignment: Si $O_2$ 3–5%, $Fe_2 O_3$ 2–3%, Co 0.05%, Cu 0.10%, Ni 0.15%, Sb 0.05%, As 0.04%, $Al_2 O_3$ 3%, Mn $O_2$ (all forms) 73–75%, $Mn_3 O_4$ approx. 10%, $H_2 O$ 3–5%; and smaller amounts of Ca O, $P_2O_5$, Mg O, and others.

\* \* \* \* \* \* \*

[6.] Q. In connection with the processes described in your answer to Direct Interrogatory No. 29, please state the quantities of ore used and the quantities of other substances used (if any) and the amount of manganese dioxide obtained therefrom which was shipped to Asbury Graphite Mills, Inc.—A. 1.8 lbs. of raw manganese ore, 1.38 lbs. of sulphuric acid (75% strength) and 4 lbs of water are required to produce 1 lb. of the finished product. There are no other raw materials used.

It is contended by the plaintiff that the heating and acid bathing treatments removed from the raw ore substantially all the gangue, or waste materials, and left the manganese dioxide constituent of the ore in a somewhat more pure and usable state. The testimony of all the witnesses discloses that, when the ore in question was subjected to the high temperatures referred to in the Jacobi deposition, *supra*, some oxygen was released from the manganese dioxide and a new product, referred to as a manganese sesquioxide, was formed. However, as will appear from a fuller review of the testimony, hereinafter set forth, the extent of this change varied considerably, according to the evidence of the various witnesses.

The plaintiff relies, in large measure, for the support of its contentions, upon the testimony of Martin H. Johnson, a chemical engineer, who holds the degree of bachelor of science in chemical engineering from the University of Wisconsin. Mr. Johnson who, at the time of the trial, was employed by the Ray-O-Vac Co., of Madison, Wis., as manager of advanced research and as a manganese consultant, testified that he has specialized in the field of electrochemistry, as well as in the field of manganese processing (R. 38–39). He stated that African Gold Coast manganese ore, which was the raw material used by the English shipper to produce the involved merchandise, is not "activated," but that the imported merchandise was activated in England by subjecting it to the processes described in the Jacobi deposition, *supra*; that the activating process involved removing impurities. The witness also stated that metallic manganese is not a substance that exists as such in nature (R. 100). He further testified that all the compounds named in paragraph 50 of the Tariff Act of 1930, as modified, *supra*, are chemical compounds of "manganese combined with borate, with sulphate, resinate, organic material" (R. 105). In referring to the Jacobi process, to which the imported materials were subjected, the witness testified as follows:

\* \* \* you can follow one particle all the way through the process if you so desire, and you will find the product that is there at the end was there at the start. It hasn't been changed.

Q. That is the manganese product?—A. * * * It hasn't been changed other than the fact that you have removed some of these soluble constituents. The particle size may be slightly smaller, but that is the same particle that was there at the start.

Q. Is that true of the articles in paragraph 50?—A. That is not true of the articles in paragraph 50. (R. 109.)

\*          \*          \*          \*          \*          \*          \*

JUDGE MOLLISON: Is manganese dioxide a compound chemically?

THE WITNESS: Manganese dioxide is a chemical compound. (R. 111.)

On the question of what constitutes a manganese concentrate, Mr. Johnson testified as follows:

Q. What is a manganese concentrate?—A. A manganese concentrate is an ore material which has been upgraded as regards the manganese content. We have removed the undesirable elements as far as practical.

JUDGE WILSON: By upgrading, you mean increasing the content of the thing you are after?

THE WITNESS: That is correct, increasing the content of the particular material that we are after. It may be manganese carbonate. It may be a mixture of manganese carbonate and something else. It may be manganese dioxide. It may be a type of manganese dioxide, but we are trying to upgrade this certain constituent or group of constituents.

CHIEF JUDGE OLIVER: Does upgrade mean concentrate?

THE WITNESS: Yes. (R. 123–124.)

\*          \*          \*          \*          \*          \*          \*

Q. Is any ore, crude ore, useful in the battery applications without some kind of activation or upgrading?—A. Not to my knowledge. (R. 126.)

\*          \*          \*          \*          \*          \*          \*

Q. In your opinion, is the imported product, activated manganese dioxide, a manganese compound?

\*          \*          \*          \*          \*          \*          \*

THE WITNESS: In my opinion it is not a manganese compound.

CHIEF JUDGE OLIVER: What is it?

THE WITNESS: It is a mixture of compounds. It contains manganese oxide. It contains silicon and aluminum dioxide, iron, and a number of impurities. (R. 127–128.)

The witness further stated that, in his opinion, the imported product is a manganese ore. (R. 128.)

On the question of whether the imported product was substantially the same as the crude ore, the witness testified as follows:

CHIEF JUDGE OLIVER: As you know it to be, is the imported activated manganese dioxide imported from England the same in all material respects as the ore as it comes from the ground, if it were just ground up and pulverized?

THE WITNESS: No.

CHIEF JUDGE OLIVER: There has been something done to the original ore before it comes to the imported product?

THE WITNESS: Yes.

CHIEF JUDGE OLIVER: The gangue has been removed and the other impurities have been removed?

THE WITNESS: Yes.

CHIEF JUDGE OLIVER: And it has gone through this process of washing, heating, etc.?

THE WITNESS: Yes.

CHIEF JUDGE OLIVER: In other words, it is several steps removed from the ore as found in nature?

THE WITNESS: That is correct. (R. 128–129.)

On cross-examination, Mr. Johnson gave the following testimony:

X Q. Does a chemical reaction take place in this process as described by Jacobi?—A. Certainly.

\*     \*     \*     \*     \*     \*     \*

X Q. What is the chemical reaction?—A. Which chemical reaction?

X Q. Start with the first one. Does the heating cause a chemical reaction?—A. Yes, the heating can cause a chemical reaction.

X Q. Does it?—A. Normally there is a conversion, correct.

X Q. What do you mean by a conversion?—A. Of some of the manganese dioxide from the high valence state, Mn plus 4, which is manganese dioxide, to Mn plus 2, which is manganese monoxide, a mixture of manganese dioxide and manganese monoxide. (R. 136.)

\*     \*     \*     \*     \*     \*     \*

X Q. Then what is the purpose of roasting the manganese dioxide?—A. The purpose of roasting the manganese dioxide is to enhance the battery active components of the ore.

X Q. Which are what?—A. Manganese dioxide of the battery active type.

X Q. How do you enhance it, by converting it into $Mn_2 O_3$?—A. By heating it and changing the surface; by removing from that surface these lower oxides so formed. Some of this manganese dioxide present in the original ore in many cases, which we ourselves have had considerable experience with, are absolutely not battery grade materials until they have been so treated.

X Q. I am trying to find out, do you do the roasting to get the $Mn_2 O_3$ to combine with the acid in preference to having $Mn O_2$ with the acid; is that the purpose of it?—A. Normally that is what we are trying to do, yes.

X Q. Is it because the $Mn O_2$ is not soluble in sulphuric acid and the $Mn_2 O_3$ is?—A. $Mn_2 O_3$ is not soluble. The $Mn O$ portion of $Mn_2 O_3$ is soluble.

X Q. Is $Mn O_2$ soluble?—A. $Mn O_2$ for all practical considerations is insoluble in the acid.

X Q. So that am I correct in understanding that the roasting is to have the $Mn_2 O_3$ instead of $Mn O_2$ since the $Mn_2 O_3$ contains the $Mn O$, which is soluble in the sulphuric acid, and the $Mn O_2$ would not be soluble?—A. Because the $Mn_2 O_3$ so formed contains the $Mn O_2$ and the $Mn O$, which is soluble. (R. 146–147.)

Defendant called two expert witnesses, William F. Nye, chief of the Analyses Investigation Section of the Chemical-Physics branch of the United States Signal Corps Engineering Laboratory, Fort Monmouth, N. J., and Dr. Ernest S. Nossen, director of research and vice president of E. S. Nossen Laboratories, Inc., in Paterson, N. J.

Mr. Nye holds a bachelor of arts degree in chemistry from Allegheny College in Pennsylvania. He also did graduate work in chemistry and metallurgy at Carnegie Tech and took extension courses in metallurgy from Penn State. He spent 3½ years as a chemist with the Jones & Loughlin Steel Corp. in Pittsburgh, Pa., and, in 1942, became attached to the Fort Monmouth Engineering Laboratory, where he is engaged "in battery testing, battery research and development." Since 1947, he has been chief of the analyses and investigation section. Mr. Nye testified that "Among the materials that we work with are battery materials. Included in that is manganese dioxide." (R. 161–162). He stated that he was familiar with African Gold Coast manganese dioxide, having tested a great deal of it at the Signal Corps laboratories, and that he was acquainted with the process described by Mr. Jacobi in this deposition, having made substantially similar tests himself.

Mr. Nye testified, in part, as follows:

Q. Based upon your experience, do you know what the resultant product would be, or products would be, if one were to take African Gold Coast manganese dioxide, crush it, and heat it to 750 degrees centigrade, based upon your knowledge and education?—A. Yes.

\* \* \* \* \* \* \*

Q. What would the resultant product be?—A. \* \* \* When that material is heated up in air, the first change that takes place is at approximately 350 degrees the conversion of the manganese dioxide to the phase known as beta manganese dioxide, which corresponds to the mineral pyrolusite. At a more elevated temperature, at about 600 degrees, the material, the manganese dioxide is converted to $Mn_2 O_3$, manganese sesqui oxide.

\* \* \* \* \* \* \*

Q. At 700 to 750 degrees, would it still be $Mn_2 O_3$, or something else?—A. The next chemical reaction or conversion would take place at approximately 900 degrees centigrade, where the material would be converted into $Mn_3 O_4$, which has been described as hausmanite.

\* \* \* \* \* \* \*

JUDGE MOLLISON: You have jumped from 600 to 900 degree temperature. Did anything happen in the way of a product being formed at about 700 to 750 degrees centigrade?

THE WITNESS: No. The main reaction that would take place in that immediate temperature range is the reaction at around 600 degrees from $Mn O_2$ to $Mn_2 O_3$, manganese dioxide to manganese sesqui oxide.

JUDGE MOLLISON: By this roasting process at approximately 600 degrees centigrade you get manganese dioxide?

THE WITNESS: You would reduce manganese dioxide. In other words, oxygen would be liberated from the compound, and the valence state would be reduced from 4 to 3.

JUDGE MOLLISON: How would you reduce it?

THE WITNESS: That is known as a thermal decomposition. At a temperature of 600 degrees centigrade that material, Mn $O_2$ is not stable. It breaks down by giving up oxygen.

\*     \*     \*     \*     \*     \*     \*

Q. Is it reduced? Does it lose oxygen?—A. Yes.

Q. And by losing oxygen it is converted from Mn $O_2$ to $Mn_2$ $O_3$?—A. Yes.

\*     \*     \*     \*     \*·     \*     \*

Q. Is $Mn_2O_3$ a chemical compound?—A. Yes. (R. 169–173.)

Concerning the chemical changes which occur when manganese dioxides are subjected to high temperatures, Mr. Nye testified that manganese dioxide, as such, does not exist at a temperature of 700 to 750 degrees centigrade; that, when manganese dioxide is heated to a temperature in excess of around 600 degrees centigrade, which would include 700 to 750 degrees centigrade, the material is reduced, that is, it decomposes, liberates oxygen, and becomes a chemical compound, known as $Mn_2O_3$. Mr. Nye further testified as follows:

JUDGE WILSON: Mr. Nye, you start out with manganese dioxide, and it is treated with heat, or in some other way, as to bring about a chemical reaction, so you have a new combination, with no new materials introduced. Would the resulting material, in your opinion, be a new compound?

THE WITNESS: Absolutely.

\*     \*     \*     \*     \*     \*     \*

Q. Does the Gold Coast ore then undergo the same sort of action when heated at 700 to 750 degrees centigrade?—A. The Gold Coast ore is predominantly manganese dioxide, and as such does undergo the same conversion at a temperature of approximately 600 degrees centigrade. (R. 179.)

On the distinguishable differences between the raw African Gold Coast manganese ore and the product resulting from the treatment of such ore by the Jacobi method or a similar process, the witness testified as follows:

Q. You testified the manganese dioxide which was the product of the manganese sesqui oxide, one of the products of the manganese sesqui oxide and the sulfuric acid, was different than the manganese dioxide you started with; that is before you heated it, is that correct?—A. Yes.

Q. In what way did it differ?

\*     \*     \*     \*     \*     \*     \*

A. The particle morphology has changed. The crystal structure has changed. The surface area of the material has changed. The chemical composition has changed.

Q. And is it upon these various changes that you predicate your answer and conclusion that the manganese dioxide, which was one of the products of the manganese sesqui oxide and the sulfuric acid, was different than the manganese dioxide which you started with, and you originally heated?—A. Yes, that plus the fact it has undergone two chemical reactions.

Q. What are those two chemical reactions?—A. A reduction from Mn $O_2$ to $Mn_2$ $O_3$, and oxidation from $Mn_2$ $O_3$ to Mn $O_2$.

Q. Are they both chemical reactions?—A. Yes. (R. 211–212.)

Dr. Ernest S. Nossen, an unusually well-qualified witness in his field, testified that he had read the Jacobi interrogatories, and, through experience as a chemical engineer, was familiar with the processes therein described; that he had followed the same procedures as early as 1934; that he had experimented on manganese ores from Java as well as from the African Gold Coast; and that, when he treated the raw manganese African Gold Coast ore in the manner described in the Jacobi process, he obtained the following results:

Q. Do you know how much manganese dioxide you got in the process from the original ore?—A. About 55 per cent, as I recall, manganese dioxide. As a finished product I got from the original ore, putting in 100 pounds, I got about 55 pounds of this activated manganese dioxide.

Q. What happened to the rest of the manganese dioxide?—A. The rest was taken up in the form of manganese sulfate.

The witness then testified:

Q. Doctor, as a chemist, do you know what concentration is?—A. Yes.

Q. Do you know what concentrates are?—A. Yes.

Q. Based upon your educational background, and your experience, is the manganese dioxide produced or obtained from the process described by Mr. Jacobi, and which you personally did, a manganese concentrate?

    \*       \*       \*       \*       \*       \*       \*

A. No.

Q. Why not?—A. The manganese dioxide content of the starting material is generally higher in this process than the manganese dioxide content in the finished product, for two reasons. First of all, the finished product contains at least actually more of the impurities, because the manganese sulfate solution does not contain the impurities. The impurities, with the exception of a few, but the major impurities, as aluminum oxide and silica, are retained in the manganese dioxide product. Secondly, the water content of the finished product, which is a hydrated product, is much higher than the water content of the starting product. These two add up to the fact that generally the manganese dioxide content is somewhat lower in the finished product than it is in the starting product, so we have no concentrate. (R. 224–226.)

    \*       \*       \*       \*       \*       \*       \*

Q. Is the manganese dioxide, the activated manganese dioxide, more suitable for use in batteries than the African Gold Coast manganese dioxide?—A. Yes.

    \*       \*       \*       \*       \*       \*       \*

Q. Why?—A. It has a higher reactivity, and gives a higher capacity to the batteries made by it. Of course all such statements are limited to certain conditions under which the batteries are used. It might turn up that for certain purposes Gold Coast ore material is superior to such an activated manganese dioxide. It depends on the drain under which the battery is discharged. (R. 235–236.)

Under cross-examination, Dr. Nossen testified that the hydrated manganese dioxide present in the finished product, as imported, was not present in the starting material (R. 238); that the manganese dioxide

contained in the African Gold Coast ore is destroyed in the heating process (R. 254); that, assuming the Jacobi process was carried out, as shown by the Jacobi deposition, the major portion of the original manganese dioxide was reduced to $Mn_2O_3$ (R. 254–255).

At the conclusion of the trial, counsel for plaintiff took the position that plaintiff's evidence demonstrated that the active manganese dioxide in the imported material contains the same desired constituents as were present in the original ore (R. 354); that, when paragraph 302 (a) of the Tariff Act of 1930 refers to ores or concentrates, it includes the imported product, which contains a portion of the $Mn\ O_2$ found in the original ore; that the Jacobi process did not result in a new manganese dioxide, as distinct from the product particles in the original ore; that the imported material is not a chemical compound, within the meaning of paragraph 50, nor *noscitur a sociis* as other manganese compounds in paragraph 50; and that, if the material is not properly classifiable under paragraph 302 (a), it should be held dutiable under paragraph 214 of the tariff act as an undecorated earthy or mineral substance.

On the other hand, the Government takes the position that, through the Jacobi process, the African Gold Coast ore was so treated that a new chemical compound was derived from the ore and that the imported material was properly classified under paragraph 50.

In his brief, counsel for the plaintiff argues at length that a study of the relevant tariff legislation indicates that Congress did not intend to include "battery grade ores or battery grade activated ores, or beneficiated ores in the provision for manganese compounds" under paragraph 50, but only "chemicals * * * obtained by chemically treating manganese sulphate or manganese dioxide (the chemical) * * *." In support of this theory, counsel quotes from the Summary of Tariff Information, 1921, pages 137 and 363. It is true that the Tariff Commission, at that time, in making recommendations to Congress, did suggest that a paragraph be included in the Tariff Act of 1922 covering manganese compounds and that paragraph 51 of the Tariff Act of 1922, as enacted, contains exactly the same language as paragraph 50 of the Tariff Act of 1930. However, the Tariff Commission, in the information provided for the guidance of Congress at that time, also called attention to the fact that "Manganese ore is exempt from duty under paragraph 540 of the act of 1913" and, for the first time was, under the act of 1922, being placed under the "same paragraph with the ferro-alloys and alloying metals." Furthermore, the Commission, while pointing out that "Manganese oxide occurring as a natural mineral and exempt from duty under paragraph 540 of the act of 1913 is covered by the provision in this paragraph for manganese ore and concentrates," stated:

* * * Manganese oxide made by chemical means, also exempt from duty under paragraph 540 of the act of 1913, is included in the suggestion under para-

graph 44 [47] that manganese salts and compounds be specially provided for. [Summary of Tariff Information, 1921, page 363.]

In the Summary of Tariff Information for 1948, Volume 1, page 97, the following pertinent information is set forth:

This summary covers all the manganese compounds, except potassium permanganate. The principal compounds of commercial importance included here are manganese sulfate, chloride, dioxide, resinate, linoleate, and borate. * * * The compounds are produced from domestic and imported manganese ores.

The manganese compounds as a whole are used principally in the manufacture of special fertilizers, stock and poultry feeds, paint driers, catalysts, and ceramic products. * * * Maganese dioxide is used in the manufacture of storage batteries, glass, rubber products, chemicals, and other manganese compounds. * * *

It requires no citation of authorities to support the proposition of law that courts should follow the legislative intent, where possible, in construing statutes. However, counsel for plaintiff assumes a factual situation, i. e., that the imported mineral is a "battery grade," a "battery grade activated," or a "beneficiated" manganese ore as a starting point for determining congressional intent. We do not believe that the record in this case warrants such a finding. Mr. Johnson, plaintiff's principal witness, conceded that "Manganese dioxide is a chemical compound" (R. 111). He, however, expressed the opinion that the imported mineral is an ore, rather than a manganese compound—"It is," he said, "a mixture of compounds" (R. 128). Yet, the witness conceded that the imported product, because of the process to which it was subjected in England "is several steps removed from the ore as found in nature" (R. 129). Furthermore, on cross-examination, Mr. Johnson admitted that the Jacobi process, *supra*, involved chemical reactions; that manganese dioxide was converted into manganese monoxide (R. 136), stating in this connection, as heretofore outlined, as follows:

X Q. Is $Mn\,O_2$ soluble?—A. $Mn\,O_2$ for all practical considerations is insoluble in the acid.

X Q. So that am I correct in understanding that the roasting is to have the $Mn_2\,O_3$ instead of $Mn\,O_2$ since the $Mn_2\,O_3$ contains the $Mn\,O$, which is soluble in the sulphuric acid, and the $Mn\,O_2$ would not be soluble?—A. Because the $Mn_2\,O_3$ so formed contains the $Mn\,O_2$ and the $Mn\,O$, which is soluble. (R. 147.)

In further refutation of the contentions advanced on behalf of the plaintiff, reference to the testimony heretofore given is pertinent. Defendant's witness Nye testified positively that manganese dioxide cannot exist in a temperature of from 700 to 750 degrees centigrade, the heat to which the ore was subjected in the Jacobi process (see answer, interrogatory 31, exhibit 1–A) (R. 179). On this point, Mr. Nye explained that "When you heat manganese dioxide to a temperature in excess of around 600 degrees centigrade, which would include

700 to 750 degrees centigrade, the material is reduced, that is, it decomposes, liberates oxygen, and you have a chemical compound known as $Mn_2O_3$," which product is known as "manganese sesqui oxide." The witness also testified that African Gold Coast manganese ore is predominantly manganese oxide.

In the opinion of this witness, the manganese dioxide, which was the product of the manganese sesquioxide, "one of the products of the manganese sesqui oxide and the sulfuric acid, was different than the manganese dioxide" in the starting material, that is, before heating, in that the chemical composition has been changed, and the original ore has undergone two chemical reactions.

Defendant's witness Nossen corroborated Mr. Nye's testimony. Referring to the Jacobi process, *supra*, he stated: "the hydrated manganese dioxide which is present in the finished product is not present in the starting product, * * *" (R. 238). The witness further testified that the active manganese dioxide contained in the African Gold Coast ore is destroyed in the heating process (R. 254).

As generally understood, the term "ore" refers to a mineral substance in its natural state as removed from the earth, and the term "ore" is defined in Webster's New International Dictionary, second edition, unabridged, 1956, as follows:

ore * * * 1. A natural or native mineral that, usually, may be profitably mined and treated for the extraction of any of its constituents. * * * 4. *Mining.* Any material containing valuable metallic constituents for the sake of which it is mined and worked; * * *. Although not strictly correct, *ore*, for want of a more appropriate term, is often applied to nonmetalliferous material, as sulphur, fluorite, etc.

The same authority defines "activate" as follows:

activate * * * b *Ore Dressing.* In flotation, to alter the nature of the surface of (specific mineral particles in an ore pulp) so that certain reagents will adhere.

"Beneficiate" is defined in these words:

beneficiate * * * b To concentrate or otherwise prepare for smelting (esp. iron ore), as by drying, sintering, magnetic concentration, etc.

From the record, as well as from the comments in the summaries of tariff information, and according to the dictionary definitions, ores are natural minerals which have not been subjected to chemical changes, and we are of the opinion that Congress did not intend that materials of the type now before us should be included under the provisions of paragraph 302 (a) of the Tariff Act of 1930, as modified by T. D. 51802, as manganese ore.

Based upon the record, we must also conclude that Congress could not have intended to classify materials of the type exemplified by the importation as concentrates. The case of *United States* v. *C. J. Tower & Sons*, 43 C. C. P. A. (Customs) 49, C. A. D. 608, decided December 2, 1955, appears to us to be conclusive on this point. In

that case, the appellate court quotes extensively from dictionaries and encyclopedias, as well as from technical works on minerals, in reaching the conclusion that the authorities "are in complete accord with Webster's definitions, to the effect that a concentrate must be the product of a process which involves no substantial chemical change." Such is not the situation before us, because all the testimony taken together indicates that, when the raw product, or ore, was subjected to the Jacobi process, a substantial chemical change did occur, and that the involved product resulting from the treatment of the raw African Gold Coast manganese ore was a new chemical compound, a manganese compound.

There remains for determination the question as to whether the product before the court is more properly classifiable under paragraph 214, as modified, under the provisions therein for "Earthy or mineral substances * * * not specially provided for, * * * not decorated in any manner," as alternatively claimed, than under paragraph 50, as modified, *supra*, as classified.

In contending that paragraph 50 is not applicable herein, counsel for plaintiff proceeds upon the theory again of legislative intent, with which we have already dealt. Plaintiff also takes the position that, for tariff purposes, there is a distinction between "chemical compounds and mixtures of chemical compounds" and asserts that, if this were not true, "every nonenumerated manufactured article would be classified as a 'chemical compound' and there would be no need for catch-all or basket provisions, such as Paragraph 1558." In support of this contention, plaintiff cites *Quong Yuen Shing Co.* v. *United States*, 31 C. C. P. A. (Customs) 43, C. A. D. 247; *United States* v. *The Water Treatment Co. of America, Etc.*, 33 C. C. P. A. (Customs) 174, C. A. D. 332; and *Sun Yuen Hing & Co.* v. *United States*, 65 Treas. Dec. 967, T. D. 47102. The plaintiff, however, fails to distinguish between a mixture of compounds, all of which are useful and, for tariff purposes, valuable, and a compound mixed with other compounds in lesser quantities, which are impurities, rather than valuable separate compounds.

In the *Quong Yuen Shing Co.* case, *supra*, the merchandise consisted of "a mixture containing 82.15 per centum monosodium glutamate, 16.75 per centum sodium chloride (salt) and 1.10 per centum moisture, used for flavoring soups and gravies." In that case, the mixture of chemical compounds was construed not to consist of one predominant compound with other compounds constituting impurities, but as separate compounds, which had lost their identity in becoming one manufactured article, and that the tariff paragraph under consideration there was not applicable, since it provided for mixtures of chemical compounds, while the merchandise in question contained a compound, specifically provided for elsewhere.

In *The Water Treatment Co.* case, *supra*, the merchandise was "composed of 51.9% water, 4.0% sodium hydroxide, 19.2% sodium carbonate, and 24.9% 'Sodium Salts of Vegetable Acids.'" The merchandise was held to be properly classifiable under paragraph 5 as a mixture of chemical compounds, rather than as a nonenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930. It is apparent that, in that case also, no question of compounds consisting of impurities was before the court. Furthermore, neither paragraph 50 nor paragraph 214 was under consideration by the court. There, the competitive paragraphs were 5 and 1558. It should also be pointed out that *The Water Treatment Co.* case, *supra*, in effect, overruled the *Quong Yuen Shing Co.* case, *supra*. We cannot see how the cases cited by counsel are controlling here, where it is conceded that only one compound of value is involved, and where, in our opinion, it must be found that a new chemical compound was created through the treatment of the raw ore. Furthermore, we are here dealing with two entirely different paragraphs, and, in our opinion, manganese dioxide is surely more specifically provided for under paragraph 50 of the Tariff Act of 1930 as a manganese compound than under paragraph 214 as "Earthy or mineral substances."

We are of the opinion that the plaintiff has failed to establish the incorrectness of the collector's classification and the correctness of its own claims. For the reasons stated aforesaid, we hold the involved merchandise properly dutiable at the rate of 20 per centum ad valorem under paragraph 50 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as a manganese compound, not specially provided for, as classified. The protest is, therefore, overruled. Judgment will be entered accordingly.