(C.D. 2062)

C. J. TOWER & SONS *v.* UNITED STATES

United States Customs Court, First Division

(Decided January 15, 1959)

*Michael Stramiello, Jr.*, and *Kirkland, Fleming, Green, Martin & Ellis* (*Perry S. Patterson* and *Herbert J. Miller, Jr.*, of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

*Barnes, Richardson & Colburn* (*James F. Donnelly* of counsel) *amicus curiae.*

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise at bar, imported from Canada, bears the trade name "Lioxin." It was classified under paragraph 28(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as "Vanillin, from whatever source obtained, derived, or manufactured" and assessed with duty at the rate of 22½ per centum ad valorem, plus 3½ cents per pound, the ad valorem assessment being upon an appraisal based upon American selling price as provided in paragraph 28(c) and section 402(g) of the tariff act.

The plaintiff claims the importation properly · classifiable at the rate of 12½ per centum ad valorem under paragraph 5 of the pertinent act, as amended, *supra*, providing for "All chemical elements, all chemical salts and compounds · * * * and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for," or, alternatively, at the

applicable rate of duty under paragraph 1558 of the act as nonenumerated manufactured articles. Plaintiff also claims the appraisements of the merchandise upon the basis of American selling price are illegal and void.

The following stipulation was entered into by counsel for the respective parties:

The product covered by the above-enumerated protests bears the trade-name "Lioxin" and was appraised at $2.25 per pound, net packed, on the basis of American selling price as defined in Section 402(g) of the Tariff Act of 1930.

The Collector of Customs classified said product as "Vanillin" under the provisions of paragraph 28(a) of said Act and assessed duty thereon at the rate of 3½ cents per pound and 22½ per centum ad valorem, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade (T.D. 52739).

"Lioxin" is composed of the following chemical compounds in approximately the following proportions:

Vanillin $(C_8H_8O_3)$ _____ 96 to 97 per cent
Acetovanillone $(C_9H_{10}O_3)$ _____ 3 to 4 per cent
Other _____ traces

"Lioxin" does not conform to the specifications for color, odor, taste and melting point set forth in the U.S. Pharmacopoeia, Editions X through XV, for "Vanillin", but does conform to the other specifications for "Vanillin" set forth in said Editions of the U.S. Pharmacopoeia.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

At the time of, prior to, and since the enactment of the Tariff Act of 1930, the chief uses of U.S.P. Vanillin were, have been, and are in flavoring and in perfumery. [R. 12–13, 15.]

Ten witnesses testified for the plaintiff and four for the defendant. Fifteen exhibits were received in evidence, 11 for the plaintiff and 4 for the defendant. Plaintiff's exhibit 4 consists of a sample of "Lioxin" as imported, and plaintiff's exhibit 5 is a sample of vanillin produced by the manufacturer of "Lioxin." It is conceded that "Lioxin" and vanillin are produced from the same source material (lignin contained in the waste sulphite liquor of wood pulp), by the same processes, except that the following additional treatment of "Lioxin" is used to produce vanillin that meets U.S.P. specifications: "Lioxin" is dissolved in distilled water. This solution is then treated with carbon black to remove color and absorb some unwanted materials present in the solution. The carbon black is filtered off leaving a clear solution. This liquor is placed in a crystallizer where the warm solution is cooled and evaporated, thus forming crystals of vanillin which are separated by centrifuging. They are then dried in a vacuum drying oven. It will be observed that no new material is added in the final process except carbon black, none of which remains in the vanillin solution to enter into the end product. This last treatment clearly serves no other purpose than to remove impurities. Since "Lioxin" admittedly contains 96 to 97 per centum

28

vanillin, and, according to a preponderance of the testimony, is valuable only for its vanillin content, it is reasonable to conclude that the purpose in marketing "Lioxin" without subjecting it to the final physical treatments used to produce U.S.P. grade vanillin is, in effect, to offer a product containing a high percentage of vanillin at a price below that for which vanillin U.S.P. grade is obtainable. This conclusion is warranted from evidence presented by the plaintiff, as well as that introduced by defendant.

Plaintiff's witness, J. B. MacPherson, after stating that he had used "Lioxin" for the production of other materials, particularly antioxidants, for pharmaceutical houses, testified as follows:

Q. Mr. MacPherson, could you have used vanillin for this purpose for which you use Lioxin?—A. Yes, we could.

Q. Is there any reason why you did not use vanillin, and did use Lioxin?—A. The main reason is that the Lioxin was offered to us at a lower price than we could obtain vanillin.

Q. Would that make it more commercially feasible?—A. Yes. [R. 217–218.]

Dr. Charles A. Sankey, a witness for plaintiff, gave similar testimony:

JUDGE MOLLISON: Considering the variety of uses of both Plaintiff's Exhibits 5 and 4, how many less uses could Exhibit 4 be used for than Exhibit 5?

THE WITNESS: Exhibit 4 could not be used for any of the requirements for vanillin, dependent as they are on appearance, odor, and on taste, as has been repeatedly stated in this court. With reference to uses for the production of other chemicals, in the vast majority of cases both of them could be used interchangeably except for economic factors.

JUDGE MOLLISON: Can Plaintiff's Exhibit 4 be used in the making of pharmaceuticals?

THE WITNESS: It can, as has been testified here in the court, be used to produce other materials by chemical reaction, and those other materials may or may not be pharmaceuticals. [R. 227.]

The testimony of plaintiff's witness, R. E. Brainard, is to the same effect:

X Q. Mr. Brainard, in the production of veratric aldehyde, could you use Exhibit 5, which purports to be vanillin, U.S.P.?—A. Yes, if it is vanillin, U.S.P.

X Q. Then I take it when you use Lioxin to produce veratric aldehyde, you are interested in the 96 to 97 per cent vanillin that is in there rather than the 3 or 4 per cent acetovanillone?—A. Correct. [R. 187.]

Benjamin E. Thomas of Monsanto Chemical Co., a witness called on behalf of the defendant, testified in part as follows:

Q. There was testimony in court yesterday about the use of Exhibit 4, Lioxin, in the production of veratric aldehyde. Do you have any experience along those lines?

*　　*　　*　　*　　*　　*　　*

A. I have had direct responsibility for the production on a commercial scale of veratric aldehyde from vanillin.

\* \* \* \* \* \* \*

Q. What was the starting material for that when they came to you?—A. Vanillin.

Q. Did you ever develop any process whereby you might not use vanillin, but use some other material?—A. No.

Q. Does Monsanto produce more than one grade of vanillin?—A. Yes.

Q. What are those grades?—A. U.S.P. vanillin, and technical vanillin. [R. 241–242.]

That "Lioxin," so-called, is sold by the importer for no other purpose than to place a cheaper priced vanillin than U.S.P. grade on the market is amply demonstrated by defendant's exhibit A, a sales brochure issued by the manufacturer. While the exhibit purports to deal with the properties, reactions, and uses of "Lioxin," the booklet discusses the properties, reactions, and uses of vanillin, and not any other material. For example: On page 2 of the exhibit appears this statement: "As an indication of the properties of 'Lioxin,' physical properties of vanillin are listed below." There follows a detailed explanation of the properties of vanillin. Under the headings of "Chemistry and Typical Reactions of 'Lioxin,' " "Condensations," "Oxidations," "Reductions," "Substitutions," "Etherification," "Esterification," and " 'Lioxin' Applications," the pamphlet (defendant's exhibit A) discusses vanillin, and vanillin only, as the material which the seller is offering to the market.

It is admitted by the plaintiff that if the imported merchandise is, in fact, vanillin, it has been properly classified under the *eo nomine* provision for vanillin in paragraph 28(a), whether produced from lignin or some other source material. However, the plaintiff takes the position "that Lioxin is not vanillin and is not provided for in Paragraph 28(a)." On the other hand, the defendant contends that the issue is one of law only as to whether a material admittedly containing 96 to 97 per centum vanillin is or is not included under the *eo nomine* provision for vanillin in paragraph 28(a). *Amicus curiae* states the issue in substantially the same way.

Plaintiff offered considerable testimony to support its claim that at the time of the enactment of the tariff act the term "Vanillin" in the commerce of the United States meant only that product meeting U.S.P. specifications. It clearly appears from plaintiff's evidence, however, that while "Lioxin" cannot be used for flavoring and for perfumery (the principal uses of U.S.P. grade vanillin R. 63, R. 184, R. 191), yet it (Lioxin) is really valuable only for its vanillin content, and that vanillin U.S.P. grade may be used for any of the purposes for which "Lioxin" is employed. (See excerpts from testimony, *supra.*) In other words, the acetovanillone in "Lioxin" serves no useful purpose. Referring to the chemical compound, acetovanillone,

under a subheading of its discussion on vanillin, the Encyclopedia of Chemical Technology, volume 14, page 610, makes the following statement:

> * * * Acetovanillone may occur as an impurity (up to 3%) in vanillin as prepared from waste sulfite liquor. For many chemical purposes, crude vanillin containing a small amount of acetovanillone as an impurity is available commercially and may be substituted for pure vanillin.

Defendant's testimony supports the claim that there are two grades of vanillin, that which meets U.S.P. specifications, and technical grade, which contains some impurities. (See R. 243–244; 248; 274; 316–319; 323; 329–330; 342–343.)

The record in this case presents the question whether only vanillin meeting all U.S. Pharmacopoeia specifications is covered by the *eo nomine* designation for "Vanillin" in paragraph 28(a). We must decide whether a product not meeting all U.S.P. standards, but valuable only for its vanillin content, and for many purposes used as a substitute for vanillin, is covered by the *eo nomine* provision for vanillin.

Plaintiff's first contention is that "Lioxin" is a mixture containing principally vanillin and acetovanillone, each of which is a synthetic, aromatic, and odoriferous chemical (R. 100, 193), and that, as such, it is not classifiable under paragraph 28(a), *supra*, which expressly excludes "mixtures of synthetic odoriferous or aromatic chemicals." This position is not supported either by the record in the case or by the law. It clearly appears from the testimony that "Lioxin" is not the result of a deliberate mixing of vanillin and acetovanillone but that for all practical purposes the acetovanillone in the imported product is an impurity left in the merchandise in the manufacturing process (R. 27–36). The 96 to 97 per centum vanillin in "Lioxin" is the chemical entity of value desired (R. 169, 187), the vanillin in the product determining its reactions, characteristics, and marketability.

The law relative to chemical mixtures as used in the tariff act is against plaintiff's contention. In the case of *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T.D. 38238 (affirmed, one justice dissenting, in *United States* v. *Aetna Explosives Company*, 256 U.S. 402), at page 306, our appellate court stated:

> A chemical mixture can hardly be held to cover a material compound of a chemical substance with which there has been commingled by accident, and with no intent or purpose of forming a compound for use, a quantity of other material which may in itself constitute a chemical. This might constitute a mixture in the literal sense, as in this case two chemical substances are mixed, but it seems clear that such a mixture is not what is referred to in the statute. What was meant was, as we think, a mixture which is adapted to use as such. * * *

In the case of *F. B. Vandegrift & Co., Inc.* v. *United States*, 38 Cust. Ct. 187, C.D. 1861, it was held that certain "Manganese Dioxide,"

manufactured from manganese ore by chemical processes, was a manganese compound rather than a mixture of chemical compounds, since the evidence established that the manganese dioxide was the compound sought for. The court differentiated in its holding between a mixture of compounds, all of which are useful, and a compound, mixed with impurities, in the following language:

* * * Plaintiff also takes the position that, for tariff purposes, there is a distinction between "chemical compounds and mixtures of chemical compounds" and asserts that, if this were not true, "every nonenumerated manufactured article would be classified as a 'chemical compound' and there would be no need for catch-all or basket provisions, such as Paragraph 1558." * * * The plaintiff, however, fails to distinguish between a mixture of compounds, all of which are useful and, for tariff purposes, valuable, and a compound mixed with other compounds in lesser quantities, which are impurities, rather than valuable separate compounds.

We are, therefore, of the opinion that the merchandise before us is, for tariff purposes, one chemical compound, vanillin, useful as such, and not a mixture or combination of compounds.

The cases of *United States* v. *The Water Treatment Co. of America, etc.,* 33 C.C.P.A. (Customs) 174, C.A.D. 332, and *United States* v. *Schenker's, Inc.,* 15 Ct. Cust. Appls. 460, T.D. 42645, cited by the plaintiff, are clearly distinguishable from the instant case. Unlike the merchandise here under consideration, the products in the cited cases, classified as mixtures or combinations of chemical compounds, had their valuable properties imparted to them by reason of the admixture of all of the components which they contained and not from one chemical compound.

In our opinion, the evidence in this case supports the contention of the defendant that the imported "Lioxin," containing as it does such a substantial percentage of vanillin, is a grade of vanillin conforming in all essential respects to the vanillin *eo nomine* provided for in paragraph 28(a) of the tariff act. This conclusion follows clearly from the testimony of plaintiff's own witnesses.

There is also much evidence in the record that there are on the market two grades of vanillin, U.S.P. and technical. While it appears from the testimony that additional processing and purification of the technical product are required to obtain vanillin conforming to the U.S. Pharmacopoeia standards, the record further demonstrates, in our opinion, that, as compared to the process required in the production of "Lioxin" from waste sulphite liquors, the final purification steps in the process to obtain U.S.P. vanillin were comparatively simple operations in which "Lioxin" is dissolved, filtered, evaporated, centrifuged, and dried (R39; 69), which steps, the testimony indicates, are standard procedures in the purification of a product (R. 70).

The plaintiff further maintains that, despite the 96–97 per centum of vanillin contained in the imported merchandise, the involved

product is not vanillin properly classifiable under paragraph 28(a), citing the cases of *Hopkins Co.* v. *United States*, 12 Ct. Cust. Appls. 296, T.D. 40312; *American Smelting & Refining Co.* v. *United States*, 12 Ct. Cust. Appls. 212, T.D. 40226; *United States* v. *C. J. Tower & Sons*, 35 C.C.P.A. (Customs) 22, C.A.D. 366. The facts in the cited cases are, however, clearly distinguishable from those in the case at bar.

Unlike the issue in the *Hopkins Co.* case, *supra*, the controversy here is not between a provision for "refined" and one for "crude" merchandise. The testimony in that case showed that the importation, admittedly "camphor," was not suitable for the chief use to which refined camphor was put. The concept of chief use, however, is not here involved.

In the *American Smelting & Refining Co.* case, *supra*, certain arsenical flue dust was held not to be free of duty as "arsenic or arsenious acid" under paragraph 387 of the Tariff Act of 1913, because the imported article was not imported as arsenious acid, nor was it intended for use or sale as such, but as a material for another smelting operation by means of which the arsenious acid of commerce would be produced. As has been pointed out in previous paragraphs of this decision, while "Lioxin" cannot be employed for some of the purposes for which vanillin conforming to U.S. Pharmacopoeia standards is used, yet, the only use that can be made of the imported "Lioxin" is that of a substitute for vanillin and nothing else. The preponderance of the evidence establishes that "Lioxin" is usable as an article of commerce in its condition as imported as a technical grade of vanillin. The *C. J. Tower & Sons* case, *supra*, is also distinguishable from the case at bar.

Plaintiff's principal contention is that the commercial meaning of the term "Vanillin" excludes the imported merchandise bearing the trade name "Lioxin" from classification under the provisions of paragraph 28(a). Plaintiff argues that the commercial meaning of vanillin at the time of the enactment of the Tariff Act of 1930 including only such vanillin as met the specifications set forth in the U.S. Pharmacopoeia. During the trial of the case, counsel for the plaintiff put the following statement into the record:

The issue here is whether or not Lioxin, the imported product, comes within the commercial meaning of the tariff term "Vanillin," as it was enacted in the Tariff Act of 1930. [R. 5.]

In its brief, plaintiff cites the cases of *United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T.D. 32998, and *United States* v. *Walter et al.*, 4 Ct. Cust. Appls. 95, T.D. 33371. These cases cite the well-recognized rule that language will be presumed to have the same meaning in commerce that it has in ordinary use, unless the contrary is shown. It is recognized that "the com-

mercial designation of an article among traders and importers, where such designation is clearly established, fixes its character for the purpose of the tariff laws." (*Cadwalader* v. *Zeh*, 151 U.S. 171, 176.)

It must not be overlooked, however, that, in asserting the applicability of the rule of commercial designation, the party claiming a commercial meaning for an article different from the common meaning has the burden of establishing that fact by competent proof. In the *Georgia Pulp* case, *supra*, the Government prevailed because it established to the satisfaction of the court a commercial meaning for the involved importation different from the common meaning. We do not believe that in the case at bar the importer has satisfactorily discharged that burden of proof.

The testimony of plaintiff's witnesses that the merchandise at bar, in its condition as imported, was not suitable for use in the flavoring and perfumery trade, while showing the type of vanillin required for the indicated purposes, was limited to those engaged in the food, flavoring, and perfumery trade. It must be kept in mind that the name "Lioxin" is a mere trade name, having no significance whatever in determining the tariff classification of the product. Even were it demonstrated that the meaning contended for by the plaintiff was definite, general, and uniform in the trades indicated, proof of this character is not sufficient to establish a commercial designation for the importation. In addition, the testimony of plaintiff's witnesses is not conclusive. Plaintiff's own witness, Bush, testified that vanillin "referred to a product * * * *generally* as prescribed by the United States Pharmacopoeia" (R. 107). [Italics ours.] Plaintiff's witness, Manheimer, testified that he did not know whether the vanillin he dealt with in 1930 conformed or did not conform to the specifications set forth for vanillin, U.S.P. grade (R. 147). The record does show that it is the vanillin molecule which is the essential and desired element in the imported product, it being further established through the testimony of one of the plaintiff's witnesses that "in the vast majority of cases" both "Lioxin" (plaintiff's exhibit 4) and vanillin (plaintiff's exhibit 5) could be used interchangeably (R. 227), but that the imported product was used instead of vanillin because "Lioxin" could be obtained at a lower price (R. 217).

Plaintiff further contends that the common meaning of the term "Vanillin" also excludes "Lioxin," calling attention in this connection to the definition of vanillin found in Webster's New International Dictionary, 1930 edition, wherein, at page 2265, it is stated:

**vanillin,** *n. Chem.* A white crystalline substance, $C_8H_8O_3$, the fragrant constituent of vanilla. It is extracted from vanilla pods, and is also obtained by the decomposition of coniferin, by the oxidation of eugenol, and by other methods Chemically it is the *m*-methyl derivative of protocatechuic aldehyde.

Plaintiff maintains that the cited authority indicates that "Lioxin" cannot be considered as a product falling within the scope of the defined term "Vanillin" since "It is not a white crystalline compound * * * is not the 'fragrant constituent of vanilla' and it is not 'used as a substitute for vanilla.' "

In the above connection, plaintiff contends, in effect, that because the instant grade of vanillin does not conform exactly and literally to the dictionary description of "Vanillin," the importation at bar is thus excluded from the common meaning of that term. Dictionary descriptions *per se* are not, however, conclusive in fixing the meaning of a term within the common acceptation. In *United States* v. *Page N. Goffigon*, 43 C.C.P.A. (Customs) 172, C.A.D. 625, the importer claimed that the merchandise there imported, "Crushed Pumice Stone," was excluded from the common meaning of pumice stone (paragraph 206, Tariff Act of 1930), contending that the common meaning of that term was limited to those grades and forms of pumice stone suitable for abrasive use and that the imported pumice stone was not so suitable. The court, in holding that the imported pumice stone embraced all forms of that material, at page 175, stated:

Although each of the quoted definitions states that pumice stone is extensively used as a polishing material or abrasive, none of them restricts identification of the material contingent on actual use, or suitability for use, in those respects. Similar statements of uses are frequently found in definitions of materials. For example, Webster's New International Dictionary (1923), in defining hydrofluoric acid, states it "is chiefly used in etching glass"; so, too, in defining potassium cyanide, it is said that "it is used especially in electroplating and in the cyanide process." It is obvious, however, those uses are stated by way of information only, and do not limit the meaning of the terms defined.

The defendant asserts that the fact that the chief recognized use of vanillin in 1930 was in flavoring and in the perfumery trade, does not, of itself, indicate a congressional intent to so limit the tariff term "Vanillin." In the *Goffigon* case, *supra*, page 177, the court stated:

Appellee cites portions of the legislative history of tariff provisions relative to pumice stone. That history undoubtedly shows that the chief recognized use of pumice stone, as of 1930, was as an abrasive or polishing material, but it does not *per se* establish a Congressional intent to limit the meaning of the term "pumice stone" to such forms of that material as are suitable for abrasive or polishing use.

So, too, in the case at bar, we are of opinion that the indicated use of vanillin as a flavor or in the perfumery trade, as indicated in certain authorities, does not preclude the imported product from inclusion within the common meaning of the term "Vanillin."

The defendant, maintaining that the meaning of the term "Vanillin" is not restricted to the U.S.P. grade, directs our attention to the material on this product found in the first and second editions of "The Condensed Chemical Dictionary," the references therein being

made about or prior to the enactment of the present tariff act on the subject. In said volumes, it is noted that vanillin may be purified by "crystallization," which observation is in conformity with the testimony of plaintiff's witness, Dr. Sankey (R. 41) and which is likewise corroborated by the reference data respecting vanillin in defendant's exhibit A, page 1. Further, in the above-referred-to volumes, two grades of vanillin are listed, a so-called "Technical" grade and a "U.S.P." grade.

Plaintiff offered testimony that delivery of the imported product "Lioxin" would not be accepted as a good delivery for "Vanillin" (R. 164–165). There is evidence in the record, however, that for odor-masking purposes either "Lioxin" or U.S.P. vanillin could be used, the difference being that the use of U.S.P. vanillin, in such case, would involve the payment of a greater price (R. 346). The record further discloses that to a chemist desiring the vanillin molecule, "Lioxin" would be a good delivery for vanillin, and vanillin would be a good delivery for "Lioxin," although again, in this case, the use of vanillin, U.S.P., would cost more. Furthermore, where there are different grades or forms of a substance, proof that delivery of one grade or form would not be a good delivery for another grade or form, is material only to the extent of showing that the grades or forms are not interchangeable with one another for all purposes. That does not mean, however, that a grade of a product *eo nomine* designated in a tariff act is not classifiable as is the commodity designated under the tariff term. *Mawer Co.* v. *United States*, 7 Ct. Cust. Appls. 493, T.D. 37108. It might well be that "Lioxin" might not be a good delivery for "Vanillin" only because of the fact that the purchaser had not indicated or specified which grade was desired (R. 343–346).

Plaintiff contends that this court is bound by Food and Drug Administration regulations for vanillin purity standards, citing *A. Maschmeijer, Jr., Inc.* v. *United States*, 39 C.C.P.A. (Customs) 139, C.A.D. 476. In this connection, plaintiff maintains that the classification contended for by the Government herein is at variance with the Federal Food, Drug, and Cosmetic Act and urges that this court adopt the same ruling as was made in the *Maschmeijer* case, *supra*. It is significant to observe that the court, in the *Maschmeijer* case, *supra*, adhered to the ruling expressed by the court in *Merck & Co.* v. *United States*, 24 Treas. Dec. 824, T.D. 33463, at page 826, as follows:

The underlying governmental purpose of the food and drugs act is entirely different from that of the customs tariff. It might be that the Secretary of Agriculture would reach the conclusion that extracting the caffein from the coffee was in a measure, at least, adulterating it; that is, reducing its strength, and therefore it could not properly be sold as coffee. The adulteration of an article, unless it constitutes a refining or manufacturing of a raw material, does not change its classification for tariff purposes. *Many commodities as they are*

*imported come in in various grades and degrees of purity, and yet if they are specifically provided for in the tariff law, and there is no qualifying provision with reference to grade or degree of purity, they are all alike classified under that specific provision.* * * * [Italics supplied.]

The holding in the *Merck* case, *supra*, was adopted by our appellate court in *United States* v. *Mercantil Distribuidora, S. A., et al.*, 45 C.C.P.A. (Customs) 20, C.A.D. 667. In the case of *Distillers Co., Ltd.* v. *United States*, 6 Cust. Ct. 180, C.D. 456, the court, page 184, said:

> * * * There being no definition of a flavoring extract in the tariff act, we hold that the fact that these commodities are not of the strength specified in the regulations under the Food and Drugs Act is not sufficient to exclude them from the aforesaid provision of the tariff act. If there is anything about the quality or strength that renders them not merchantable under the Food and Drugs Act, that pertains to another department of the Government.

It appears to us significant and decisive for our present determination that our appellate court, in the *Hopkins* case, *supra*, in discussing the standards set up by the U.S. Pharmacopoeia for certain products, page 299, stated:

> The tests of the Pharmacopoeia are standard tests for the determination of the strength, color, and purity of drugs used as medicines or for the making of medicinal preparations. The Pharmacopoeia does not furnish and does not purport to furnish the tests which will determine the fitness of articles for purely *industrial* use. [Italics added.]

As heretofore indicated, plaintiff has not established a commercial meaning for the term "Vanillin" different from its common meaning. We feel justified by the record and the authorities cited in holding that the imported merchandise is within the common meaning of the term "Vanillin." The record herein indicates that the merchandise at bar is an impure or technical grade of vanillin but "one step short of the finished product" (R. 243). When the impurities are removed, vanillin conforming to the standards of the United States Pharmacopoeia is obtained (R. 38–40), defendant's exhibit A. Accordingly, the term "Vanillin," being an *eo nomine* designation without limitation, all grades of the product, including one such as the "Lioxin" at bar with a 96–97 per centum vanillin content, which product is used as vanillin and for the purposes of vanillin in all its reactions, are covered by said *eo nomine* designation. (*Schade & Co.* v. *United States*, 5 Ct. Cust. Appls. 465, T.D. 35002; *Merck & Co.* v. *United States*, 24 Treas. Dec. 824, T.D. 33463.) In *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, 201, T.D. 38966, the court stated:

> * * * where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears; * * *.

For the reasons stated aforesaid, we hold the imported merchandise properly dutiable at the rate of 22½ per centum ad valorem and 3½

cents per pound under the *eo nomine* provision of paragraph 28(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as "Vanillin, from whatever source obtained, derived, or manufactured," as classified.

In view of our decision herein, plaintiff's claim that appraisement of the imported "Lioxin" on the basis of American selling price (section 402(g), *supra*) is illegal, null, and void, is overruled.

The protests in this case are overruled.

Judgment will be rendered accordingly.