**W. J. BYRNES & CO., a/c Wilbur Ellis Co.**

v.

**UNITED STATES.**

C.D. 3646; Protest No. 67/20000(B)–92982.

United States Customs Court, First Division.

Dec. 23, 1968.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak, Los Angeles, Cal., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Brian S. Goldstein, New York City, trial attorney), for defendant.

Before WATSON, MALETZ and NEWMAN, Judges.

WATSON, Judge:

The merchandise in the case at bar, invoiced as "99.9% Ethyl Vanillin", was classified for duty at the rate of 7 cents per pound and 45 per centum ad valorem under item 408.60 of the Tariff Schedules of the United States, which provides for "Other compounds", under the subtitle of "Aromatic or odoriferous com-

pounds including flavors, not marketable as cosmetics, perfumery, or toilet preparations, and not mixed, and not containing alcohol * * *".

Plaintiff claims the involved merchandise is properly dutiable at the rate of 3 cents per pound and 19 per centum ad valorem under item 408.80 of said tariff schedules under the *eo nomine* provision therein for "Vanillin".

The pertinent statutes here under consideration are as follows:

Aromatic or odoriferous compounds including flavors, not marketable as cosmetics, perfumery, or toilet preparations, and not mixed, and not containing alcohol:

Obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

\* \* \* \* \* \* \* \*

408.60     Other compounds ..................... 7¢ per lb. + 45% ad val.

From whatever source obtained, derived, or manufactured:

\* \* \* \* \* \* \* \*

408.80     Vanillin ........................... 3¢ per lb. + 19% ad val.

———◆———

Other provisions of the Tariff Schedules of the United States:

Schedule 4, headnote 2(a), provides:

2. (a) The term *"compounds"*, as used in this schedule, means substances occurring naturally or produced artificially by the reaction of two or more ingredients, each compound—

(i) consisting of two or more elements,

(ii) having its own characteristic properties different from those of its elements and from those of other compounds, and

(iii) always consisting of the same elements united in the same proportions by weight with the same internal arrangement.

The presence of impurities which occur naturally or as an incident to production does not in itself affect the classification of a product as a compound.

The record in this case consists of the testimony of two witnesses for the plaintiff and one witness who testified for the Government. Plaintiff's witness, Mr. Leonard Katz, a graduate of New York University with a bachelor of science degree in chemistry, testified that he was a chemist and a salesman employed by Naarden Company, Naarden-Flavorex Incorporated; that said firm sold flavors and flavoring materials to users of flavors (R. 3, 4). He stated that the products of the company were sold throughout the United States. The witness further stated that, as a salesman, he sold flavoring and flavoring extracts such as vanillin, and that this compound was sold to bakery supply houses and to candy and biscuit houses. The record discloses that he had been previously employed by other companies, and that among the products which he dealt in were methyl vanillin, ethyl vanillin, vanilla, strawberry, benzaldehyde, ethyl acetate, and other materials (R. 9).

Plaintiff's second witness was Mr. Paul Theodore Ludford, plant manager of Ludford Fruit Products, Incorporated. He testified that his firm manufactured

flavoring extracts, ice cream extracts, and that his firm also ran a canning plant. The witness stated that he was familiar with the uses of ethyl and methyl vanillin. The record discloses that Mr. Ludford is not a chemist and holds no degree in chemistry from any college (R. 22, 24).

The witness for the Government was Mr. Denzel Curtis, a chemist for the United States Government, employed by the Customs Service. The record discloses that he holds bachelor and master of science degrees from the University of California and Cornell University, with major subjects in agriculture, chemistry, and botany. Defendant's witness testified that he had had scientific papers published in the above-mentioned subjects and that he had taught at the Pennsylvania School of Horticulture, at Brigham Young University, and at Utah State Agricultural College (R. 26, 27).

The sole issue in this case is whether the imported product, ethyl vanillin, is encompassed within the *eo nomine* provision in item 408.80 for "Vanillin", "From whatever source obtained, derived, or manufactured". Plaintiff, directing our attention to a number of cases decided by our appellate court, maintains that the classification of the ethyl vanillin at bar is controlled by the application of the well-established principle that an *eo nomine* statutory designation without words of limitation or a shown contrary legislative intent or judicial decision to the contrary, and without proof of commercial designation to the contrary, will include all forms of the article. We are, of course, in agreement, with the above-enunciated principle. This rule of construction, however, has as a prerequisite the showing that the particular merchandise is so named. The Lannom Manufacturing Co. v. United States, 55 Cust.Ct. 86, C.D. 2556.

Plaintiff in the case at bar specifically contends that there is nothing in the tariff history of the *eo nomine* provision for vanillin which indicates any restrictions or any congressional intention to restrict the scope of said provision; and, further, in view of the legislative history, that technical, scientific definitions in terms of chemical formulae, set out in dictionaries, are not pertinent or controlling of the meaning of the term "Vanillin" as used in the tariff laws. In our opinion, however, the legislative history, as it pertains to schedule 4 of the Tariff Schedules of the United States, manifests the intent of Congress to make a significant departure from the use of common meaning in determining the classification of chemicals under schedule 4 of the tariff schedules. It appears clear that the classification of chemical substances under said schedule 4 of the tariff schedules is to be governed by technical, scientific definitions, and that chemical distinctions among the numerous chemical compounds provided for therein are to be given great weight in determining the correct classification of imported chemical compounds.

In the Tariff Classification Study Explanatory and Background Materials, schedule 4 (November 15, 1960), the Tariff Commission, page 2, reported the following:

> Schedule 4 is primarily a classification system for chemicals and closely related chemical products. It places all chemicals and related products in a systematic, logical arrangement, using terminology which takes cognizance of the vast changes which have occurred in the chemical field since 1930, and eliminates anomalies and archaic and illogical classifications. The chemical industry introduces tens of thousands of new products to commerce each year and about half of the current sales of chemicals today are products unknown twenty years ago. Schedule 4 provides for these developments and anticipates, so far as practicable, such changes in the character of international trade as may occur in the near future.

> *In proposed schedule 4, wherever possible the products have been de-*

*scribed in technical, chemical terminology. The use of such terminology imparts greater certainty to the tariff descriptions. Persons trading in chemicals are generally familiar with technical descriptions no matter how they may otherwise describe their goods. Of course, it is not intended that the use of scientific description impose upon chemical elements or chemical compounds any requirement of laboratory purity. Obviously, commercial standards of purity are acceptable and correct* (see definition of "compounds" in headnote 2). [Emphasis added.]

Similarly, in the Tariff Classification Study, supra, the Tariff Commission reported (at page 59):

The existing tariff act provides for many organic chemical compounds of "nonbenzenoid" structure classified by functional groups such as acids, alcohols, and esters. This coverage is vague, confusing, and inadequate for present-day needs. Most of the functional groups used are unnecessarily restrictive, while others are widely scattered in different paragraphs.

Part 2D includes each of the functional groups specified in the existing tariff act, but with broader, more complete scope, and also includes several additional groups of importance.

Because many organic chemical compounds are embraced within two or more different functional groups, these groups are arranged so that a compound described in two or more groups would be classifiable in the first group in which it is described. The order of precedence of these functional groups is generally that used in naming and indexing chemical compounds by Chemical Abstracts, a publication of the American Chemical Society. Most of the existing provisions for organic compounds have been assimilated into part 2D without change in rate of duty. Any new "basket" class made up of compounds in different existing overlapping "baskets" at different rates of duty is given the rate which has been applied to most of the imports in recent years. This consolidation has resulted in some changes in the rates of duty. However, such changes, which are incidental to desirable clarification, are believed to be insignificant.

Further evidence supporting the position of the Government that Congress intended the use of technical and scientific terminology to govern the classification of chemicals under schedule 4, Tariff Schedules of the United States, is found, in our opinion, in schedule 4, headnote 2(a), supra, which defines the term "compounds" in terms of substances having two or more elements, "having *its own characteristic properties different from those of its elements and from those of other compounds, and * * * always consisting of the same elements united in the same proportions by weight with the same internal arrangement.*" [Italics ours.] In the case at bar, plaintiff's witness, Mr. Katz, testified that "ethyl" vanillin and "methyl" vanillin are forms of vanillin. His testimony, on cross-examination, however, militated against such a conclusion. In this connection, plaintiff's witness testified that the chemical structure of "ethyl" vanillin and "methyl" vanillin are not the same, and that, in fact, these chemicals are two separate and distinct compounds. He further testified that ethyl vanillin is *three and a half times stronger in concentration than methyl vanillin and that "vanillin" is methyl vanillin and not ethyl vanillin* (R. 17, 18, 19) [italics added]. The Government's witness also testified that ethyl vanillin and methyl vanillin are not the same chemical compounds. He further testified that the differences consist of the "methyl" group in the case of methyl vanillin, and the "ethyl" group in the case of ethyl vanillin. Further, the witness stated that ethyl vanillin is not found in a natural state in nature, but is always synthesized, whereas methyl vanillin is found in a natural state in nature (R. 28, 30, 31). Mr. Curtis further testified that, chemically speaking,

one could not substitute methyl vanillin for ethyl vanillin (R. 32).

■ It is fundamental that we may refer to lexicons and other suitable authorities to aid us in determining the common meaning of a word. United States v. Tropical Craft Corp., 42 CCPA 223, C.A.D. 598; United States v. C. J. Tower & Sons, 44 CCPA 1, C.A.D. 626. With reference to ethyl vanillin and methyl vanillin, we note the following:

The Condensed Chemical Dictionary, 1956, defines ethyl vanillin as follows (at page 466):

ethyl vanillin (ethovan; bourbonal; vanillal; vanirom; 3–ethoxy–4–hydroxy benzaldehyde) $OHC_6H_3(OC_2H_5)CHO$

Properties: Fine, white crystalline material, having an intense odor of vanillin; affected by light; m. p. 76.5° C; soluble in alcohol, chloroform, and ether; slightly soluble in water.
Grades: N.F.X.
Use: Flavors, as a replacement or fortifier of vanillin.

———◆———

Vanillin is defined in The Condensed Chemical Dictionary, supra, as follows (at page 1146):

vanillin (3–methoxy–4–hydroxybenzaldehyde; vanillic aldehyde) $(CH_3O)\ (OH)C_6H_3.$  CHO. *The methyl ether of prctocatechuic aldehyde.* It occurs in vanilla bean extract and in many balsams and resins.

Properties: White crystalline needles; pleasant aroma; vanilla taste. M. p. 80°–82° C; b. p. 285° C. Soluble in 125 parts water; in 20 parts glycerol and in 2 parts 95% alcohol.

Derivation: By the oxidation of isoeugenol or guaiacol, or by extraction of the vanilla bean; also from sulfite waste liquor upon heating with alkali at 160° C, and from lignin, or wood itself (especially spruce).
Method of purification: Crystallization.
Grades: Technical; U. S. P. XV.
Containers: 1–, 5-lb cartons; 5-lb bottles; 5–, 25-lb cans; 25–, 100-lb drums.
Uses: Perfumes; flavoring; pharmaceuticals; a reagent. [Italics ours.]

———◆———

The above references, in our opinion, indicate that even within the common understanding, the term "Vanillin" is restricted to methyl vanillin, and that the product at bar, ethyl vanillin, is not embraced within the meaning of the term vanillin. This conclusion is reinforced by the testimony of plaintiff's own witness on cross-examination that ethyl vanillin and methyl vanillin have different chemical structures and that the term "Vanillin" is the common name of methyl vanillin and not ethyl vanillin (R. 17–18). Other authorities likewise point out the differences between ethyl vanillin and methyl vanillin. See, Merck

Index, Seventh Edition, 1960, at pages 437 and 1089; also, United States Dispensatory, 1960, at page 559 and page 1481. Accordingly, it appears that in the light of the testimony of record and the authoritative sources above cited, ethyl vanillin is neither derived from nor is it a form of vanillin (methyl vanillin). In our opinion, the mere fact that both compounds may be used for flavoring purposes, as testified by plaintiff's witness, does not bring "ethyl" vanillin within the *eo nomine* provision for "Vanillin" as provided for in item 408.80 of the tariff schedules. That provision is clearly not predicated upon use for classification purposes.

■ Plaintiff in the case at bar directs our attention to a number of cases (plaintiff's brief pages 8–15) holding in effect that a chemical compound, which is an "impure" form of, or a derivative of, a compound *eo nomine* provided for in the tariff act, is classifiable under that provision. It appears well settled that, absent legislative intent to the contrary, an impure form of a named compound would be dutiable under the named provision for such compound. Schedule 4, headnote 2(a), supra, specifically indicates that the presence of impurities which occur naturally or as an incident to the production of an article does not, in itself, affect the classification of a product as a compound.

Both parties to this controversy direct our attention to the holding of the court in C. J. Tower & Sons v. United States, 42 Cust.Ct. 25, C.D. 2062, affirmed in 47 CCPA 85, C.A.D. 734. There, certain merchandise known as "lioxin" was classified under paragraph 28(a) of the Tariff Act of 1930, as modified, as "Vanillin", and was claimed properly dutiable under paragraph 5 of the said act as a combination or mixture of chemical compounds not specially provided for. At the trial therein, it was stipulated that the importation in question consisted of 96 to 97 percent "Vanillin" and 3 to 4 percent acetovanillone, with

traces of other materials; and that it did not conform to the specifications for color, odor, taste, and melting point set forth for "Vanillin" in the United States Pharmacopoeia. It was further stipulated that the chief uses of U.S.P. vanillin were in flavoring and in perfumery. This court held the involved Lioxin dutiable as vanillin, as classified, overruling the importer's protest.

In affirming the decision of this court in the C. J. Tower & Sons case, supra, our appellate court (C.A.D. 734) pointed out that the evidence of record established that both "Vanillin" and "Lioxin" have a common origin, being produced from liquor of wood pulp; that when Lioxin was used chemically, it was very similar to U.S.P. vanillin, but that since it was substantially cheaper, it was used commercially where a vanillin reaction was desired. In its decision, the appellate court in the *Tower* case, supra, at pages 86–87, stated:

We think it clear that a product containing 96 to 97 percent of vanillin would, within the common meaning, be considered as vanillin. It is noted that the Second Edition of the Condensed Chemical Dictionary, published in 1930, under the word "Vanillin" lists both U.S.P. and "Technical" grades, thus indicating that there is a product less pure than U.S.P. which is called vanillin.

As the Customs Court observed, it is well settled that, in the absence of a showing of a contrary legislative intent, an *eo nomine* provision for an article without terms of limitation includes all forms of the article. Smillie & Co. v. United States, 11 Ct.Cust. Appls. 199, T.D. 38966; United States v. Page N. Goffigon, 43 CCPA 172, C.A.D. 625, and cases there cited. There being no evidence here of a contrary legislative intent, Lioxin appears to be included within the tariff provision for vanillin, notwithstanding the fact that it includes three or four percent of impurities.

In the *Tower* case, supra, since the imported Lioxin was used for the same chemical reactions as U.S.P. vanillin and, as a matter of fact, consisted of 96 to 97 percent vanillin, our appellate court concluded that the presence of the chemical acetovanillone was merely an impurity and that Lioxin was dutiable as vanillin. In the case at bar, however, the record indicates that the merchandise here involved, in its imported condition, is neither derived from ·vanillin nor is it a chemical substitute for vanillin. The holding of the court in *Tower* is distinguishable and not controlling in the case at bar.

The case of Fries Brothers v. United States, 4 Treas.Dec. 850, T.D. 23338, also cited by the plaintiff, likewise lends no support to the plaintiff's contention that ethyl vanillin is dutiable under the *eo nomine* provision for "Vanillin". There, the Board of General Appraisers held that since the merchandise at issue was in fact "Vanillin" to which a chemical had been added to disguise its identity to permit plaintiff to obtain a lower rate of duty, and since the foreign ingredient was easily removed from the vanillin, the importation there in question remained vanillin for tariff purposes. The situation in the *Fries Brothers* case, supra, was different from that in the case at bar. In summary, the cases cited by the plaintiff in support of its claim are distinguishable and are not controlling in the determination of the proper classification of the involved merchandise.

■ On the basis of the record here presented, we hold the involved merchandise properly classifiable under item 408.-60 of the Tariff Schedules of the United States at the rate of 7 cents per pound plus 45 per centum ad valorem under the provision therein for "Other compounds" under the subtitle of "Aromatic or odoriferous compounds including flavors, not marketable as cosmetics, perfumery, or toilet preparations, and not mixed, and not containing alcohol * * *", as classified.

The protest is overruled. Judgment will issue accordingly.