(C.D. 3954)

Mitsugi Higashi *v.* United States

United States Customs Court, Third Division

(Decided January 22, 1970)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Morris Braverman* and *Steven R. Sosnov*, trial attorneys), for the defendant.

Before RICHARDSON, LANDIS, AND ROSENSTEIN, Judges;
RICHARDSON, J., concurring

ROSENSTEIN, Judge: The protest herein covers two entries of merchandise invoiced as "Herb Tea (Choju Cha)" and "En-Mei-Cha (Tea)", respectively, imported from Japan at Honolulu in 1967. The goods were classified under TSUS (Tariff Schedules of the United States) item 182.91 as "Edible preparations not specially provided for (including prepared meals individually packaged): Other" and assessed with duty thereunder at 20 per centum ad valorem. Plaintiff, characterizing the merchandise as "herb tea", claims that it is entitled to entry free of duty under TSUS item 160.50 as "Tea, crude or prepared".

It was stipulated at the trial that the merchandise is an edible preparation * but is not a prepared meal individually packed. The importer, Mr. M. Higashi of Honolulu, testified that his imports are limited to health foods, including the merchandise at bar, which are

_____

*Headnote 3, Subpart B, Part 15, Schedule 1 of TSUS provides:
 The term *"edible preparations"* in items 182.90, 182.91, and 182.92 embraces only substances prepared and chiefly used as a human food or as an ingredient in such food.

sold to supermarkets, grocery stores and drugstores in Honolulu and Seattle, Washington. He has handled the articles at bar for three years, which he buys and sells as "Choju Cha" and "En-Mei-Cha", and as tea. In Japanese, "Choju" means "long life", "Cha" means "tea", and "En-Mei" is a brand name. The merchandise is prepared like tea by being placed in a teapot or cup to which hot water is added.

Samples of the importations were received in evidence as exhibits 1 and 2. Exhibit 1, the Choju Cha, which is imported packed in small oblong paper bags, is composed of loquat leaf, rice straw and white nandina leaf, each of which, the witness stated, is used as tea. The En-Mei-Cha, exhibit 2, which is imported loose in a cardboard package, contains 70 per cent stinkweed plus additions of sasa-albo-marginate, boxthorn, pearl barley and herba epimedii. Both samples appear to consist of dried leaves, twigs, pieces of bark and, in the case of the En-Mei-Cha, barley. All the ingredients, the witness claimed, are teas and can be used separately to make tea.

The government's witness, a home economics director with the Honolulu Gas Company, testified that she had not heard of either product.

The sole issue herein is whether the merchandise at bar is "tea" within the meaning of item 160.50. Plaintiff cites *United Carr Fastener Corporation* v. *United States* (*Northern Screw Corp., Party in Interest*), 54 CCPA 89, C.A.D. 913 (1967), for the well established principle that an *eo nomine* statutory designation without words of limitation or shown contrary legislative intent, judicial decision or administrative practice, and without proof of commercial designation, will include all forms of said article. This rule of construction, however, has as a prerequisite the showing that the particular merchandise is so named. *W. J. Byrnes & Co., a/c Wilbur Ellis Co.* v. *United States*, 61 Cust. Ct. 423, C.D. 3646, 294 F. Supp. 944 (1968) ; *The Lannon Manufacturing Co.* v. *United States*, 55 Cust. Ct. 86, C.D. 2556 (1965). It must be recognizable as a form of the named article. See *Crosse & Blackwell* v. *United States*, 36 CCPA 33, C.A.D. 393 (1948).

Therefore, we direct our inquiry to the common understanding of the term in issue. In the absence of commercial designation, which is not here involved, words used in a tariff statute are to be construed in accordance with their common meaning. *Marshall Field & Co.* v. *United States*, 45 CCPA 72, C.A.D. 676 (1958) ; *Armand Schwab & Co., Inc.* v. *United States*, 32 CCPA 129, C.A.D. 296 (1945). Common meaning is a matter of law to be found by the court which may draw upon its own knowledge of materials within the common understanding, consult lexicons and other relevant authorities and also receive testimony, which is advisory only, of witnesses. *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388 (1948) ; *Jeffrey Martin, Inc.* v.

*United States*, 62 Cust. Ct. 533, C.D. 3821 (1969); *Warren Atlantic, Inc.* v. *United States*, 60 Cust. Ct. 36, C.D. 3250, 278 F. Supp. 302 (1968).

The question whether the Choju Cha and En-Mei-Cha herein are a variety or form of the ordinary tea of commerce (see *Two Hundred Chests of Tea*, 9 Wheat. 430 (1824), and *Chun Chy Tong & Co.* v. *United States*, 12 Treas. Dec. 482, T.D. 27702–G.A. 6474 (1906)), must be answered in the negative.

The standard reference works and the legislative history of the claimed item are in accord with our own understanding that the term "tea" does not embrace the merchandise at bar.

*The Century Dictionary*, 1891, defines tea as—

> 1. A product consisting of the prepared leaves of the tea-plant (see def. 2), of various kinds and qualities depending chiefly on the method of treatment. * * *

> 2. The tea-plant, *Camellia theifera*, often named *Thea Sinensis* (or *Chinensis*). * * *

> 3. An infusion of the prepared leaves of the tea-plant, used as a beverage, * * *.

　　*　　*　　*　　*　　*　　*　　*

*Webster's New International Dictionary*, 1934, defines tea as—

> 1. a. A shrub (*Thea sinensis*) cultivated from antiquity in China (where it is believed to be indigenous) and also grown in Japan, India, etc. * * * b. The leaves, leaf buds and internodes of this plant prepared and cured for the market by certain recognized methods. * * *

> 2. An aromatic beverage prepared from tea leaves by infusion with boiling water, * * *.

　　*　　*　　*　　*　　*　　*　　*

*Funk & Wagnalls New Standard Dictionary of the English Language*, 1941, defines tea as—

> 1. The leaves or leaf-buds of the tea-tree or tea-plant (see def. 3) prepared for use or market. * * *

> 2. A beverage consisting of an infusion or decoction of tea-leaves. * * *

> 3. A tea-plant, such as the evergreen Chinese or Japanese shrub or small tree (*Thea sinensis*) of the family *Theaceae*, or the similar *T. assamica*, of Assam and India. * * * [Tea obtained from the latter plant is described under definition 7 as "Assam tea".]

　　*　　*　　*　　*　　*　　*　　*

The 1947 and 1966 editions of the *Encyclopaedia Britannica*, published by the University of Chicago, state that tea is—

> The name given to the leaves or leaf-buds of the tea tree or tea shrub; the manufactured product prepared from the green leaves

by fermentation and firing; the drink brewed from the manufactured product; the afternoon social function at which the beverage is served.

Describing it as an "evergreen shrub, the *Britannica* notes that, botanically, it was originally designated by Linnaeus as *Thea sinensis*, and is now placed in *Camellia* as *C. sinensis* (family *Theaceae*).

*The Chemistry and Technology of Food and Food Products*, 1951 (2d ed., Vol. II, p. 1686) states, in the chapter on "Coffee and Tea", that the tea plant was first classified botanically by Linnaeus as *Thea sinensis;* genus *Thea* has come to include the Linnaean genus *Camellia;* and that Assam and China tea are considered by botanists as equivalent tea-yielding plants. The plant is described therein as "an evergreen shrub which, in its natural state, grows to a height of from 15 to 30 ft.; * * *."

The *McGraw-Hill Encyclopedia of Science and Technology* (rev. ed. 1966, Vol. 13, p. 404) describes tea as "The popular caffeine beverage made from the leaves of the tea plant, *Thea sinensis*, a member of the tea family, *Theaceae*."

*The Summary of Tariff Information*, 1929, prepared by the Tariff Commission for use of the House Ways and Means Committee in considering the Tariff Act of 1930, describes the tea of commerce provided for in paragraph 1682, Tariff Act of 1922 ("Tea, not specially provided for, and tea plants; * * *") as follows, at page 2619:

> Description and uses.—The tea plant (*Thea sinensis L.*) is an evergreen shrub cultivated in tropical and subtropical countries. From its tender leaves is derived the tea of commerce; the older, woody leaves, tea dust, waste, siftings, and stalks are used for the manufacture of caffeine, for adulterating purposes, and for the making of brick and other low grade teas. The bulk of the commercial teas may be divided into three general classes according to methods of preparation—black, green, and Oolong tea. When tea is first picked, the leaves are green. For the production of black tea the leaves are put through a process to remove part of the water present; they are then cooled, exposed to moist air at a temperature of 75° to 84° F., and finally dried or "fired." For green tea the oxidative fermentation process through which the black tea is produced must be prevented as far as possible. In China and Japan the tea leaves are heated immediately after picking in pans or baskets; in India and Ceylon the leaves are steamed in a closed vessel. Oolong tea is intermediate between black and green tea.

Similar information is found in the 1920 and 1921 *Summaries of Tariff Information* prepared by the Tariff Commission for the use

of the House Ways and Means Committee and the Senate Finance Committee, respectively, in considering the Tariff Act of 1922, and in the *Dictionary of Tariff Information*, 1924, also prepared by the Tariff Commission.

The merchandise designated in paragraph 1783, Tariff Act of 1930, as "Tea not specially provided for, and tea plants * * *" is described in the *Summaries of Tariff Information*, 1950 (Vol. 16, part 5, p. 79) as follows:

> The tea of commerce is the dried or otherwise prepared leaf of the evergreen tea plant, a shrub or small tree of the Camellia family, cultivated in warm-temperate and tropical climates, largely in the Orient. There are innumerable varieties and grades of tea on the market. The trade distinguishes three main types: (1) Green, or unfermented (unoxidized); (2) black or fermented (oxidized); and (3) oolong, an intermediate type which is semifermented (partially oxidized). Differences between these types are due to the degree of fermentation (oxidization) alone, as all three types may be prepared from the leaves of the same plant.

Although not couched in identical language, the "tea" provision of the 1930 act was carried over into TSUS item 160.50. The explanatory notes to Schedule 1, Part 11, Subpart A of the *Tariff Classification Study*, November 15, 1960, state, at page 176, that "The existing provisions relating to coffee, tea, and maté are found in paragraphs 35, 776, 1602, 1654, and 1783" which "have been combined and rearranged into 10 items under this subpart."

We note that the *Summaries of Trade and Tariff Information*, 1969 (Schedule 1, Vol. 9, p. 121) prepared by the Tariff Commission to provide information on imports in terms of the Tariff Schedules of the United States describes the merchandise covered by item 160.50 as "the dried leaf of an evergreen tree or shrub which grows in warm rainy regions of the tropics and subtropics."

It is apparent from the foregoing references that the common meaning of "tea", as contained in the dictionaries and standard reference works, has remained unchanged over the years from 1891 to the present; and that the same meaning is accorded the article as provided for in the tariff statutes.

Therefore, although tariff classification does not necessarily follow botanical or other scientific classification, *Wing Coffee Co., Ltd., et al.* v. *United States*, 53 Cust. Ct. 60, C.D. 2473 (1964), we find that the term "tea", when employed alone without other words of description, is commonly understood to mean the product of the tea plant or tea tree: it is not applicable to products used to make tealike beverages such as camomile tea, sassafras tea or herb tea.

The stinkweed, barley, rice straw, boxthorn and other ingredients comprising the subject importations are not products of the tea plant or tree; nor do they comport with or correspond to what is commonly known and recognized in the United States as tea.

For the foregoing reasons, we find and hold that the subject merchandise is not tea within the intendment of item 160.50.

The claim in the protest is overruled.

Judgment will be entered accordingly.

CONCURRING OPINION

Richardson, J. Item 160.50 of the Tariff Schedules of the United States is an unqualified provision for tea which is broad in scope and which, in my opinion, is applicable to any imported product that answers to the common understanding of the term "tea"—a category which does not end with the concept of the "teas of commerce". At the time of the enactment of the tariff schedules the common understanding of the term "tea" as reflected in the lexicons embraced products which were derivative from sources other than the tea-plant or evergreen shrub *Thea sinensis*.

In The American College Dictionary (1956 edition) at page 1242 to which our attention is drawn in the importer's brief the word "tea" is defined as "any of various infusions prepared from the leaves, flowers, etc. of other plants [meaning plants other than the *Thea sinensis* plant], and used as beverage or medicines." My own research has turned up definitions of the word "tea" to the same general effect in Webster's Third New International Dictionary (1961 edition) at page 2346, and in Funk & Wagnalls Standard Dictionary International Edition (1963) at page 1286. And in Funk & Wagnalls New Standard Dictionary (1913 through 1952 editions) at page 2472 in each edition, under the definitions for the word "tea" I find an exhaustive list of no less than 28 teas known and used around the world which are derivative from sources other than the *Thea sinensis* plant, and this, together with a partial list of the so-called "teas of commerce" which are, of course, derivative from the *Thea sinensis* plant.

The provisions of the tariff schedules were enacted to cover imported products which have little or no commercial appeal and which may in and of themselves be quite exotic, as well as products which have considerable commercial appeal. As such, I am not persuaded that a delimiting approach to the construction of the term "tea" as used in item 160.50 is warranted or proper. Where Congress has intended to restrict a provision in the tariff schedules it has done so by means which leave no doubt as to such intention.

The difficulty I find with plaintiff's case is that it lacks competent and convincing evidence of substantial use and recognition of the ingredients comprising the imported products and the products themselves in the country of origin as "teas" *prior* to their importation into this country. The evidence adduced by plaintiff tends to underscore usage of the merchandise at bar as "teas" *after* importation, which, of course, is not the appropriate area of concern for tariff classification purposes. Mitsugi Higashi, the plaintiff-importer herein, testified on cross-examination by government counsel (R. 15–16):

> Q. Are you aware of the Food and Drug regulations with regard to tea, Mr. Higashi?—A. I don't know. Before we imported it, I went to see the Food and Drug administrator. I asked for how we can import it. He give me the idea to fix up the order——
>
> Q. To fix up what?—A. Fix up all the lables [sic] like that. Japan don't make this. We translate English all. I got information from the Food and Drug inspector.
>
> Q. They told you you could describe this as tea?—A. Yes. Because we use like a tea. We drink——

Under the circumstances disclosed in this record I am of the opinion that plaintiff's failure is one of proof. And for this reason I conclude that plaintiff has failed to rebut the presumption of correctness attaching to the classification under attack in the protest, and concur in the conclusion reached by the majority herein.