**Enrique GARZA**

v.

**UNITED STATES.**

**C.D. 4192; Protest No. 67/4144–5145.**

United States Customs Court,
Third Division.
March 24, 1971.

Stein & Shostak, Los Angeles, Cal. (Marjorie M. Shostak and S. Richard Shostak, Los Angeles, Cal., of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Mollie Strum, Glenn E. Harris, and Martin L. Rothstein, New York City, trial attys.), for defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge.

ROSENSTEIN, Senior Judge:

The merchandise in this case, invoiced as "ground phosphate rock in bulk," was exported from Mexico and entered in October 1965 at the port of Eagle Pass, Texas, where it was classified under TSUS (Tariff Schedules of the United States) item 184.75 as other animal feeds and ingredients therefor, not specially provided for, and assessed with duty thereunder at the rate of 10 per centum ad valorem.

Plaintiff relies upon the claim [1] made in its amended protest that the rock phosphate at bar is properly free of duty under the provision for "phosphates, crude, and apatite" in item 480.45 of Schedule 4, Part 11 of TSUS and is thereby excluded from classification under item 184.75 by virtue of Schedule 1, Part 15, Subpart C headnote 1(a), as amended by section 6(b) of the Tariff Schedules Technical Amendments Act of 1965, Public Law 89–241.[2]

The pertinent provisions of the Tariff Schedules of the United States are as follows:

Schedule 1, Part 15, Subpart C:

*Subpart C headnotes:*

1. For the purposes of this subpart—

(a) the term *"animal feeds, and ingredients therefor"* embraces products chiefly used as food for animals, or chiefly used as ingredients in such food, respectively, but such term does not include any product provided for in schedule 4 (except part 2E thereof) or schedule 5 (except part 1K thereof); * * *

\* \* \* \* \* \*

Animal feeds, and ingredients therefor, not specially provided for:

\* \* \* \* \* \*

184.75 Other ...........10% ad val.

Schedule 4, Part 11:

480.45 Phosphates, crude and apatite ................Free

The record, which has a trial transcript running over 400 pages in length, consists of the testimony of five witnesses, three of whom appeared for

---

1. Plaintiff "does not rely on its alternate claims" (brief, p. 1), which are deemed abandoned and hereby dismissed.

2. Timely request for reliquidation pursuant to section 2(b) of Public Law 89–241 was filed by plaintiff.

plaintiff, and of 30 exhibits, 19 of which were offered by defendant (most of which were received in evidence). We shall summarize only that portion of the record which bears on the issue before us, namely, whether the merchandise comes within the provision for "phosphates, crude, and apatite."

The imported ground rock phosphate was mined from an underground deposit of phosphate rock which is chemically known as calcium phosphate. It contains calcium, phosphorous, less than 0.5 percent fluorine, and some impurities. The material was formed by the chemical reaction of phosphoric acid (resulting from bat excrement deposited in the cave) and limestone, or calcium carbonate. It is obtained from the mine in the form of rocks (illustrative exhibit 1), sand-like particles and very fine dust. The material is taken to the railroad site where it is crushed, dried to reduce the moisture content, ground to a 14 mesh, stored in a silo and then carried by chute to railroad cars. The merchandise is not defluorinated or subjected to any other process.

The imported ground rock phosphate, of which exhibit 2 is a representative sample, is a good source of phosphorous and calcium, two minerals essential to animal growth. As it is not palatable, the material is either mixed with salt in a block form and placed out in the pasture for animals to lick or, after being coated with molasses or mixed with other minerals, is added to animal feed.

The first witness, a medical doctor and assistant manager of the company that operates the rock phosphate mines from which the subject shipment was extracted (and son of the plaintiff-importer), testified that the material was dried and ground solely to save money and to facilitate transportation. In 1957 and 1958, when his company shipped the material in the form that it came from the mine, i. e., in big chunks and dust, it took ten men an entire day using wheelbarrows to load a car, but that now, when ground and collected in silos, a carload can be handled by one man in four hours.

On cross-examination, the witness stated that in 1957 and 1958 he sold unground rock phosphate to George Bernhardt, president of San Antonio Foreign Trading Company; that, subsequently, he sold him the ground rock phosphate which had to meet a 20 mesh specification; and that in 1964 the specification was changed to a 14 mesh.

The witness testified that the importation conforms to the definitions of "phosphate rock" and "apatite" in Webster's Third International Dictionary, Unabridged (R. 70–72), and that the material would be called apatite. He stated:

It would be apatite because it is a form of calcium, dicalcium phosphate, that has some other components, such as fluor, magnesium, and different components and it also has some calcium carbonate. That is in the earth from the mine that comes with the material. It is a very impure calcium phosphate. (R. 157)

\* \* \* \* \* \*

A. The phosphoric acid reacts with the calcium carbonate of the limestone and it forms the dicalcium phosphate, but since it has some other elements present, such as the fluor we have been talking about, then it wouldn't be a pure dicalcium phosphate, it would be an apatite, which is an impure form of dicalcium phosphate, an impure form of phosphate rock. It is a broad term we use. (R. 158–159)

Plaintiff's second witness, sales manager of San Antonio Trading Company, testified that he offered merchandise such as the importation at bar for sale as "rock phosphate" (R. 90). The third witness, vice president and general manager of Vit-A-Way, Inc., a manufacture of vitamin-mineral supplements and fortifications for the livestock industry, stated that he describes the imported merchandise on his company's labels and advertising matter as "low fluorine rock phosphate" (R. 196, 219).

Defendant's first witness, a rancher and part owner of Lare-Tex Feed & Mineral Company of Laredo, Texas, testified

that his company has been importing and processing low fluorine rock phosphate since 1966 from Mexico. He defined this product as a "natural occurring material which contains calcium and phosphorous, and not more than one half of one percent fluorine" (R. 275). He defined apatite as—

> * * * a natural occurring substance containing calcium, phosphorous, and fluorine, usually in other various elements, in varying amounts. (R. 310).

Defendant's second witness, national sales manager of International Minerals & Chemical Corporation of Skokie, Illinois, the world's largest miners of phosphate and potash, testified that he majored in chemistry at college, that the merchandise in issue is a "raw rock phosphate" (R. 387); and that "apatite" is a "phosphate structure found in a natural rock, phosphate rock" (R. 394). Although replying in the negative when asked if he ever used the term apatite to refer to ground rock phosphate (R. 394), the witness (who had testified that he was familiar with Mexican low fluorine rock phosphate (R. 399–402)) gave the following answers on redirect examination:

> Q. It is [plaintiff's exhibit 2] a crude rock phosphate?—A. It would appear to be.
>
> Q. Is it apatite?—A. *Yes, it would appear to be.* (R. 410). [Emphasis supplied.]

3. The court reasoned as follows (pp. 466–467):

> The imported merchandise was entered and invoiced as "minced clams." Although cut into pieces, cleaned, and cooked, according to the testimony of the importers, it can be readily identified as parts of clams. Paragraph 721 (b) of the Tariff Act of 1930 provides for "Clams, clam juice, or either in combination with other substances, packed in air-tight containers." It will be observed that this language is not restricted to clams in their raw or natural state, nor is it restricted to entire clams. It includes any clams in any condition, so long as they are clams.

By virtue of Public Law 89–241, headnote 1(a) of Schedule 1, Part 15, Subpart C, as amended, excludes from classification as other animal feeds and ingredients therefor any product provided for in Schedule 4 (except Part 2E thereof). Therefore, in order to prevail, plaintiff's burden is limited to establishing that the imported merchandise, regardless of its use, comes within the scope of the provision for "phosphates, crude, and apatite" in item 480.45. We find that plaintiff has sustained its burden of proof herein and established that the merchandise consists of apatite as provided for in the claimed provision.

Indeed, there appears to be no dispute over the basic nature of the merchandise; defendant concedes that "Based upon the record, there is no question that the importation at bar is phosphate material of the apatite variety" (brief, 23). But it argues that a "correct interpretation" of the provision limits that term to *crude* apatite (brief, 21).

We do not agree. Item 480.45 is an *eo nomine* provision. And it is long settled that an *eo nomine* statutory designation of an article, without limitation or a shown contrary legislative intent, judicial decision or administrative practice, and without proof of commercial designation, encompasses all forms of the article. Nootka Packing Co., et al. v. United States, 22 CCPA 464, T.D. 47464 (1935).[3] "Stated otherwise, all forms, grades and qualities of the named article

> "Where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears." Smillie v. United States, 11 Ct.Cust.Appls. 199, 201, T.D. 38966. In Tower & Sons v. United States, 11 Ct.Cust.Appls. 157, 162, T.D. 38948, boiled down cider was held to come within the statutory designation "cider," as against "fruit juices" and "fruit syrups," the court saying, "when the term 'cider' was written into the provision without words of limitation it must be assumed that it was intended to include all kinds of cider."

are embraced by such a designation." United States v. Williams Clarke Co., A/C American Agar and Chemical Co., 50 CCPA 67, 70, C.A.D. 822 (1963). Accord Hayes-Sammons Chemical Co. v. United States, 55 CCPA 69, C.A.D. 935 (1968).

In T. M. Duche & Sons, Inc., et al. v. United States, 44 CCPA 60, C.A.D. 638 (1957), our appellate court, holding that merchandise invoiced as "bitter orange pulp" and imported for use in orange marmalade came within the *eo nomine* provision for oranges in paragraph 743, Tariff Act of 1930, stated (pages 62–63):

> From the foregoing it is clear that the statutory term "oranges" is not limited to the fruit in its natural state but encompasses oranges which have been subjected to a variety of processing steps which have not destroyed the identity of the oranges or converted them into something else. This construction is in accord with the decisions of this court in parallel situations as, for example, Nootka Packing Co., et al. v. United States, 22 CCPA (Customs) 464, T.D. 47464, * * *.
>
> * * * * * *
>
> * * * It is clear to us that the "bitter orange pulp" in this case is, realistically, still oranges, advanced in condition, to be sure, in the direction of their ultimate use in orange marmalade, but not so far advanced as to have lost their identity or to have become a different article * * *.

Thus, unless its identity has been destroyed or it has been converted into something else by the processing, the mere drying and grinding of a designated article would not remove it from an *eo nomine* provision. This rule of construction, however, has as a prerequisite the showing that the particular merchandise is so named. Mitsugi Higashi v. United States, 64 Cust.Ct. 25, C.D. 3954 (1970); W. J. Byrnes & Co., a/c Wilbur Ellis Co. v. United States, 61 Cust.Ct. 423, C.D. 3646, 294 F.Supp. 944 (1968); The Lannom Manufacturing Co. v. United States, 55 Cust.Ct. 86, C.D. 2556 (1965). It must be recognizable as a form of the named article. See Crosse & Blackwell Co. v. United States, 36 CCPA 33, C.A.D. 393 (1948).

Therefore, even with the government's concession and the unrefuted testimony of record, we direct our inquiry to the common understanding of the term in issue. In the absence of commercial designation, which is not here involved, words used in a tariff statute are to be construed in accordance with their common meaning. Marshall Field & Co. v. United States, 45 CCPA 72, C.A.D. 676 (1958); Armand Schwab & Co., Inc. v. United States, 32 CCPA 129, C.A.D. 296 (1945). Common meaning is a matter of law to be found by the court which may draw upon its own knowledge of materials within the common understanding, and consult the works of standard lexicographers and scientific authorities in addition to receiving testimony, which is advisory only, of witnesses. United States v. Brager-Larsen, 36 CCPA 1, C.A.D. 388 (1948); Mitsugi Higashi v. United States, supra; Jeffrey Martin, Inc. v. United States, 62 Cust.Ct. 533, C.D. 3821 (1969); Warren Atlantic, Inc. v. United States, 60 Cust.Ct. 36, C.D. 3250, 278 F.Supp. 302 (1968).

There is general accord on the meaning of the term "apatite", as shown in the following definitions:

The New Century Dictionary, 1946:

> apatite. A native calcium phosphate containing fluorine or chlorine, occurring both crystallized and massive, and varying in color from white to green, blue, violet, or yellow or red: used in making fertilizers.

Funk & Wagnalls New Standard Dictionary of the English Language, 1942:

> apatite * * * *Mineral.* A vitreous sea-green, blue-black, white, etc., transparent to opaque calcium chlorophosphate or fluophosphate * * *.

Chambers's Technical Dictionary, Revised Edition, 1949:

apatite (min.) Naturally occurring phosphate of calcium, with chloride or fluoride of calcium occurring widely distributed in igneous rocks in the form of hexagonal crystals, usually of very small size.

The Condensed Chemical Dictionary, Fifth Edition, 1956:

apatite A natural calcium phosphate usually containing fluorine; sometimes with chlorine, hydroxyl, or carbonate substituting for part or all of the fluorine. * * *

The foregoing definitions also comport with those given in various commodity surveys prepared by the Tariff Commission for the use of the House Ways and Means and the Senate Finance Committees in the preparation of tariff bills.

The Summary of Tariff Information, 1929, at page 2518, describes apatite as "a naturally occurring crystalline mineral consisting of calcium phosphate and fluoride, chloride, or carbonate." The Summary of Tariff Information, 1920, states, at page 600, that apatite is a "naturally occurring crystalline mineral consisting of calcium phosphate combined with calcium fluoride, chloride, or carbonate, * * *."

The Summaries of Tariff Information, Volume 16, Part 4 (1950), cited by both parties, states, at page 114, that—

Fluor-apatite and chlor-apatite are natural calcium phosphates combined with fluorine or chlorine, fluor-apatite being the most common variety produced in the United States. * * *

■ We find that the subject merchandise comes within the common meaning of "apatite". We are not impressed with defendant's argument that the pro-

vision for "phosphates, crude" compels a like reading for "apatite", when it would have been a simple matter for Congress to expressly provide therefor if that had been its intendment.

Furthermore, the statutory history of this provision is persuasive of a differing construction from that urged by defendant. Paragraphs 1740 and 1640 of the tariff acts of 1930 and 1922, respectively, contain language identical to that in item 480.45; and the tariff acts of 1913, 1909, 1897, 1894, 1890 and 1883 all have *separate* provisions for "apatite" and for "phosphates, crude" or "phosphates, crude or native." [4] It is significant that, unlike the unrestricted provisions for apatite, the provisions for phosphates have always been limited to that material in a crude state.

■ The courts are bound to determine the intent of Congress by the language which was actually used and have no right to give any meaning to such language other than that conveyed by the words in which the legislative will was expressed. James G. Wiley Co., Seelect Dietary Products, Inc. v. United States, 65 Cust. ——, C.D. 4045 (1970); Armbee Corporation, W. J. Byrnes & Co., Inc. v. United States, 60 Cust.Ct. 105, C.D. 3728, 279 F.Supp. 438 (1968).

As the drying and grinding did not destroy the identity of the apatite, or convert it into another article, it comes within the scope of the claimed *eo nomine* provision.

In view of our finding, we do not reach the question whether the merchandise, in its condition as imported, is in a crude or advanced state.

The claim under TSUS item 480.45 is sustained; all other claims are dismissed. Judgment will be entered accordingly.

---

4. Apatite: 1913, par. 401; 1909, par. 495; 1897, par. 477; 1894, par. 377; 1890, par. 486; 1883, par. 597. Phosphates, crude: 1913, par. 574; 1909, par. 651; 1897, par. 639. Phosphates, crude or native: 1894, par. 586; 1890, par. 678. Phosphates, crude or native, for fertilizing purposes: 1883, par. 626.