ASHLAND CHEMICAL COMPANY, PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 79-8-01284

Before WATSON, *Judge.*

(Decided June 19, 1984)

*Baker and McKenzie* (*Thomas P. Ondeck, M. Page Hall, II*), *Charles Saunders, Jr.* of counsel for plaintiff.

*Richard K. Willard,* Acting Assistant Attorney General, *Joseph I. Liebman* Attorney in Charge, International Trade Field Office, *Susan Handler-Menahem* Civil Division, Department of Justice, Commercial Litigation Branch, for defendant.

WATSON, *Judge:* Plaintiff has brought this action to challenge the classification and appraisement by the Customs Service of chlorendic acid. The acid was manufactured by NV Hooker Chemical of Genk, Belgium and imported into the United States during 1977 and early 1978 by Hooker Chemicals and Plastic of Buffalo, New York (Hooker N.Y.). The merchandise had previously been consigned to plaintiff.

It is alleged by plaintiff that defendant's classification of chlorendic acid under Item 403.80, Tariff Schedules of the United States [1] (TSUS) was incorrect and that the appropriate classification is under Item 425.99 of the TSUS.[2] Plaintiff also contends that the imported merchandise was incorrectly appraised at $1.0501 per pound, and also should have been appraised at $0.8751 per pound.

---

[1] Tariff Schedules of the United States (1976).
[2] Tariff Schedules of the United States (1976).

SCHEDULE 4.—CHEMICALS AND RELATED PRODUCTS

Part 1.—Benzenoid Chemicals and Products

| Item | Articles | Rates of duty |
|---|---|---|
| | All other products, by whatever name known, not provided for in subpart A or C of this part, including acyclic organic chemical products, which are obtained, derived, or manufactured, in whole or in part from any of the cyclic products having a benzenoid, quinoid, or modified benzenoid structure provided for in the foregoing provisions of this subpart or in subpart A of this part: | |
| | *          *          *          *          * | |
| 403.80 | Other.................................................................................................................... | 1.7¢ per lb. + 12.5% ad val. |

Part 2.—Chemical Elements, Inorganic and Organic Compounds, and Mixtures

| Item | Articles | Rates of duty |
|---|---|---|
| | Acids ...................................................................................................................... | |
| | *          *          *          *          * | |
| 425.99 | Other....................................................................................................................... | 6% ad val. |

This Court finds that the article in question has been correctly classified, but improperly appraised.

The chemical name of chlorendic acid is 1,3,4,6,7,7 Hexachlorobicyclo-5-heptene-2,3-Dicorboxylic Acid and it had an empirical formula of $C_9 H_4 O_4 Cl_6$. It is a nonbenzenoid organic acid used by plaintiff for the manufacture of flame-retardant unsaturated polyesters. It can also be used for the manufacture of various other products such as paints.

The production process used for making the chlorendic acid in question combined maleic anhydride, a nonbenzenoid cyclic chemical produced from benzene, with hexachlorocylopentadiene in order to produce a cyclic nonbenzenoid, chlorendic anhydride. By combining the chlorendic anhydride with water, chlorendic acid was produced.

Upon entry of the chlorendic acid into the United States, the Customs Service appraised the merchandise by adding 20 percent to the invoice price because of the failure of Hooker, N.Y. to respond to a request for marketing information regarding chlorendic acid.

The two principal issues before this Court are the following: whether chlorendic acid, a nonbenzenoid chemical produced as a result of several chemical steps including the use of a benzenoid, i.e., benzene, was properly classified under Item 403.80 of the TSUS and whether the Customs Service correctly appraised the chlorendic acid when it added 20 percent to its entered value because of the importer's failure to supply it with requested marketing information.

As to the classification issue, the first general headnote contained within Schedule 4 Part 1 of the TSUS states:

> 1. Except as specifically set forth in the headnotes to other parts of this schedule, all products described in this part shall be classified hereunder even if more specifically described elsewhere in this schedule * * *.

The superior heading that immediately precedes and controls Item 403.80 states:

> All other products, by whatever name known, not provided for in subpart A or C of this part, including acyclic organic chemical products, which are obtained, derived, or manufactured in whole or in part from any of the cyclic products having a benzenoid, quinoid, or modified benzenoid structure provided for in the foregoing provisions of this subchapter or in subpart A of this part:

Plaintiff contends, that the chlorenic acid in question was not "obtained, derived, or manufactured in whole or in part from any of the cyclic products * * * provided for in the *foregoing* provisions * * * ." because it would be contrary to Congressional intent to interpret this phrase to include every chemical or related product discovered to exist anywhere within the chain of production of the subject merchandise, no matter how insignificant or remote the relationship. Additionally, plaintiff maintains that the coverage of Item 403.80 requires that the chemical in question be produced in a continuous manufacturing facility.

Plaintiff also argues that the subject chlorendic acid was not "obtained, derived, or manufactured from any of the cyclic products having a benzenoid, quinoid, or modified benzenoid structure * * *" because only those products which derive an essential chemical property from a benzenoid product or contain significant chemical amounts of a cyclic product having a benzenoid structure fall within the confines of Item 403.80.

This Court concludes that the plain meaning of the phrase "acyclic organic chemical products, which are obtained, derived, or manufactured in whole or in part from any of the cyclic products having a benzenoid * * * structure provided for in the foregoing provisions * * *" includes those chemical products whose chain of production originated with a cyclic product having a benzenoid structure covered under subpart A and B of Schedule 4 Part 1 of the TSUS.

The de minimus tests discussed in *United States* v. *Cavalier Shipping Co. Inc.,* 60 CCPA 152, C.A.D. 1103 (1973), 478 F.2d 1256 and *United States* v. *Aceto Chemical Co.,* 64 CCPA 78, C.A.D. 1186 (1977), 553 F.2d 685, requiring a quantitative presence or qualitative contribution of a benzenoid element do not control the classification of the product in question because those cases involved the issue of whether or not a benzenoid ingredient was present within

a mixture in a meaningful way. Those cases do not shed any light on the issue of whether benzene was used in the production process in such a way as to make an ultimate product "obtained, derived, or manufactured" from a benzenoid.

Even if this Court accepts plaintiff's argument regarding the qualitative test discussed in *Cavalier* and *Aceto*—the subject chlorendic acid was still properly classified under Item 403.80. It is stipulated in the record that the chemical reaction that took place in order to formulate the chlorendic acid under dispute began with maleic anhydride, which was produced by combining a benzenoid, i.e., benzene, with oxygen. Without the contribution of the 4 carbon atoms from the benzene, the maleic anhydride could not have been formulated. It thus remains clear, that with respect to the subject chlorendic acid, a benzenoid, namely benzene, played a significant role in the formulation of the final product. The fact that, as plaintiff argues, butane could have been substituted for benzene has no bearing on the role that the benzene actually did play in the formulation of the chlorendic acid in this action.

The courts have defined the terms "obtained, derived, or manufactured from" in analogous statutes on several occasions.

The Board of General Appraisers construed the term "derived from" in the phrase "dyes derived from anthracin" in its decision *In re Pickhardt & Kuttroff*, T.D. 20728, 1 Treas. Dec. 373 (1897).

In that decision, the Board stated:

> The words "dyes derived from anthracin" mean dyes of which anthracin is the *source* or *base*. They do not mean anthracin itself, nor dyes made wholly of anthracin, but dyes produced or obtained from anthracin by the *extraction of some of its elements and their utilization by actual substitution with other substances.* 1 Treas. Dec. at 377 [emphasis supplied]

This definition of "derived from" was approved by the Court of Customs and Patent Appeals in *Kuttroff, Pickhardt & Co., Inc.* v. *United States,* 21 Ct. Cust. Appls., 332, T.D. 46864 (1934) as well as by the Court in *Esso Standard Oil Co.* v. *United States,* 44 Ct. Cust. Appls., 102, C.A.D. 644 (1957) where the Court also commented as follows:

> A substance may properly be said to have been *derived from* a source material even though the process by which it was produced from that material involved the *addition* of ingredients from other sources. 44 Ct. Cust. Appls. at 106. [emphasis supplied]

*See also, BASF Colors & Chemicals Inc.* v. *The United States,* 56 C.C.P.A., 47, 52, 53, C.A.D. 952 (1969) and *Ciba Geigy Corporation.* v. *United States,* 79 Cust. Ct. 53, 59, C.D. 4713 (1977) *rev'd on other grounds,* 65 CCPA 80, C.A.D. 1210, 582 F.2d 26 (1978).

The Explanatory Notes for Schedule 4, Part 1 of the TSUS contained within the *Tariff Classification Study of 1960,* a recognized

source of legislative history, state that Item 403.70 (403.80's predecessor) is considered a "basket" provision for Part 1 of Schedule 4 and it is based on the provisions of paragraph 27(a) (3) and (4) of the Tariff Act of 1930 as well as prevailing practice.

As originally published for public hearings, the "basket" provision covered articles:

> obtained, derived, or manufactured in whole or in part from *any* of the products provided for in the foregoing provisions of this subpart or in subpart A of this part. [emphasis supplied] [3]

Subsequently, the language was changed to include articles:

> obtained, derived, or manufactured in whole or in part from any of the *cyclic products having a benzenoid or modified benzenoid structure* provided for in the *foregoing* provisions of this subpart or in subpart A of this part. [emphasis supplied] [4]

The modification was made in order to confine the "basket" provision within its intended limits insofar as the original language "would have literally included acyclic chemicals found naturally in coal tar." *Tariff Classif. Study,* 1960, at p. 21.

This delimitation of the "basket" provision does not exclude the chlorendic acid in the instant case from the coverage of Item 403.80 of the TSUS because the benezene used to produce the chlorendic acid in question is *not* considered an *acyclic* material naturally found in coal tar but is clearly a *cyclic* material expressly covered within subpart A.

Moreover, by upholding plaintiff's interpretation of the term "foregoing" and excluding from Item 403.80 a nonbenzenoid, chlorendic acid whose chain of production began with a benzenoid would result in the unreasonable *contraction of the "basket"* of Item 403.80 of the TSUS and contravene Congressional intent to include within Item 403.80 "acyclic and other nonbenzenoid products obtained, derived, or manufactured from cyclic products having a benzenoid structure."

Additionally, Congress has specifically provided that the interpretation of language contained within the chemical schedule of the TSUS be governed by their technical and scientific meaning rather than their ordinary commercial definitions. *See W.J. Byrnes & Co., A/C Wilbur Ellis Co.* v. *United States,* 61 Cust. Ct. 423, C.D. 3646, 294 F. Supp. 944 (1968).

The testimony of defendant's expert witness, Dr. Solaway, a chemist, regarding the "chemical" definition of obtained, derived, or manufactured was persuasive on the question of technical or scientific meaning. According to Dr. Solaway "derived from" simply means coming from, made from, obtained from and does not have any limitations as to how many intervening chemical steps are in-

---

[3] Tariff Classif. Study, 1960, at 20.
[4] *Id.* at 20.

volved in the process of obtaining a final product. The chemical definition of "derived" in Dr. Solaway's opinion thus clearly does not require that the final product be produced in one production facility. It was his conclusion as a chemist, that the chlorendic acid in question was derived from a benzenoid within the chemical meaning of the term.

Thus, the plain meaning of the pertinent subheadings of the TSUS, prior judicial interpretations of the term "derived from," the legislative history of the TSUS, as well as defendant's expert testimony regarding the chemical meaning of "derived from" lead this Court to uphold the classification of the chlorendic acid in question under Item 403.80 of the TSUS.

As to the second principal issue, plaintiff has alleged that the appraisement of the merchandise in question solely as a reaction to a failure to supply information was arbitrary and not in accordance with the law.

The Court agrees with plaintiff. The Customs Service has a duty when it is appraising merchandise to use "all reasonable ways and means," 19 U.S.C. § 1500. The unsupported addition of twenty percent to the invoice price of the merchandise in question by the Customs Service, because of Hooker New York's failure to supply it with requested information is unreasonable, contrary to the guidelines of Schedule 4, Part 1 of the TSUS and 19 U.S.C. § 1401a and is thus clearly erroneous.

The defendant has suggested alternative appraisements under U.S. value or export value, see 19 U.S.C. § 1401a, based on its contention that there were sales of "such or similar merchandise" within the meaning of 19 U.S.C. § 1401a(f)(4) at the same time that it was appraising the merchandise in question. There is insufficient evidence in the record to support defendant's claims.

The plaintiff has suggested a valuation based on export value, using the invoice price of the merchandise in question as a base. There is also, however, insufficient evidence in the record to support plaintiff's proposed valuation. The special relationship between Hooker New York and Hooker Belgium creates an unresolved question of whether the invoice price of the chlorendic acid imported in this action represents merchandise "freely sold in the ordinary course of trade," within the meaning of 19 U.S.C. § 1401a(f).

This Court, for the aforementioned reasons, holds that an appraisement based on the unsupported addition of twenty percent to an invoice price because of the failure of an importer to supply the Customs Service with requested information is erroneous.

There is insufficient evidence before the Court to reach a final judgment. Even if it would be correct in a formal sense to say that plaintiff has a burden of proving its claimed appraised value, the consequence of a failure to do so should not automatically be a victory for the government. *Jarvis Clark Co.* v. *United States.* Appeal

No 83-1106, Slip Op. (C.A.F.C. May 2, 1984) and *House of Adler, Inc.* v. *United States,* 2 CIT 274, 277–78 (1981). This is a logical corollary of the general powers given to the Court under 28 U.S.C. § 2643(b), when the Court considers that further administrative or adjudicative procedures are needed to enable it to reach a correct decision. The Court is of the opinion that further proceedings are needed in this case in order to determine a proper appraised value.

Accordingly, this Court, pursuant to its authority under 28 U.S.C. § 2643b, orders that, within thirty days, both parties shall agree upon a date to meet in conference with the Court to discuss further steps for the resolution of the appraisement issue.

This Court further holds that the classification of chlorendic acid, produced from a chain of production that relied upon a benzenoid, was correctly classified under Item 403.80 of the TSUS.