(C.D. 4809)

JOSEPH F. HENDRIX A/C PRODUCTOS DESHIDRATADOS DE MEXICO, S.A., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 76-12-02655

(Decided June 22,1979)

*Stein, Shostak, Shostak & O'Hara, Inc. (John N. Politis* of counsel) for plaintiff.

---

[4] The case of *Parts Manufacturing Associates, Inc.* v. *United States,* 73 Cust. Ct. 42, C.D. 4552 (1974), decided by the Customs Court, but not appealed, is to be distinguished by the fact that the court there pointed out at p. 48 that the headnote defining "furniture" (headnote 1, subpart A, pt. 4, schedule 7) includes the word "aircraft", whereas it should be noted there is no mention therein of rail vehicles or cars. There has been no showing of any specific congressional intent to include rail vehicles or cars under this headnote definition.

*Barbara Allen Babcock*, Assistant Attorney General (*David M. Cohen*, Chief, Customs Section; *Susan Handler-Menahem*, trial attorney), for the defendant.

FORD, Judge: In this action plaintiff contests the assessment of duty at 7.5 per centum ad valorem on certain marigold meal which was classified by the Customs Service as other animal feeds and ingredients therefor, not specially provided for, under item 184.75, Tariff Schedules of the United States, as modified by T.D. 68–9.

Plaintiff contends said merchandise is entitled to entry free of duty under the provision of item 470.80, Tariff Schedules of the United States, as crude or processed products of vegetable orgin used chiefly for coloring. Alternatively, plaintiff contends the imported marigold meal is subject to duty at 4 per centum ad valorem as other products of vegetable origin used chiefly for coloring under item 470.85, Tariff Schedules of the United States, as modified by T.D. 68–9.

The pertinent statutory provisions involved provide as follows:

Schedule 1, part 15, TSUS:

## Subpart C.—Animal Feeds

Subpart C headnotes:
　　1. For the purposes of this subpart—
　　　　(a) the term "animal feeds, and ingredients therefor" embraces products chiefly used as food for animals, or chiefly used as ingredients in such food, respectively, but such term does not include any product provided for in schedule 4 (except part 2E thereof) or schedule 5 (except part 1K thereof);
　　　　　*　*　*　*　*　*　*
　　Animal feeds, and ingredients therefor, not specially provided for:
　　　　　*　*　*　*　*　*　*

| | | |
|---|---|---|
| 184.75 | Other | 7.5% ad val. |

Schedule 4, part 9, TSUS:

## Subpart A.—Dyeing and Tanning Products

Subpart A headnotes:
　　1. This subpart covers only materials, extracts, decoctions, and other preparations suitable for coloring (including dyeing and staining) or for tanning. All the products provided for are of vegetable

origin except cochineal (item 470.05) which is of animal origin.

2. For the purposes of this subpart—
   (a) the term "crude or processed" means materials which are crude or which have been processed by shredding, grinding, chipping, crushing, or any similar process, but not otherwise processed;

\* \* \* \* \* \* \*

Products of vegetable origin used chiefly for coloring or tanning, not specially provided for:

| | | |
|---|---|---|
| 470.80 | Crude or processed_____ | Free |
| 470.85 | Other_____ | 4% ad val. |

The record consists of the testimony of four witnesses called on behalf of plaintiff and the receipt in evidence of eight exhibits. Defendant offered the testimony of one witness. In addition, the official court papers were moved into evidence without being marked.

Mr. Herbert Spaul, the sales and production coordinator of Mountaire Feeds, Inc., the consignee of the merchandise at issue testified that the firm deals in poultry feed. The customers of his firm are primarily located in Arkansas, Alabama, and Texas. Mr. Spaul testified that they purchased marigold meal for pigmenting the tissue of chickens and the yolks of the eggs. Marigold meal according to witness Spaul is sold by its xanthophyll content which determines its price. Besides marigold meal, corn is also used by poultry feeders for its natural xanthophyll. Two to three pounds of marigold meal are ordinarily added to 1 ton of feed.

The witness testified that he had not seen the effect of marigold meal on chickens nor had he conducted any tests. Mountaire first used marigold meal in 1968. Prior to that time, corn, alfalfa, and grain products were the primary sources for xanthophyll. Corn and alfalfa both have food value whereas marigold meal is solely used for color pigmentation.

Plaintiff then called Dr. Javier Loustaunau, the director of research and development of Productos de Mexico the producer of the marigold meal involved herein. The witness received his bachelor of science degree from Monterey Institute of Technology in biochemical conditioning, a master of science from Louisiana State University in food science and technology, and a Ph. D. from Louisiana State University in food science. The witness testified that the merchandise at issue is tested and certified for its xanthophyll content. It is this content which determines the value of the marigold meal.

Dr. Loustaunau described the process by which the marigold meal was produced. The marigold flowers are picked by hand and placed on

continuous feeder machines which have a cutter at the end. The cutter separates the petals from the calyx and seeds. The petals are then dried which preserves the xanthophyll content by eliminating the moisture. The drying also reduces the bulk to about 8 percent of its original size. They are then screened and ground to the size of the merchandise contained in exhibit 2. After grinding, an antioxidant known as ethoxyquin is added to retard the oxidation of the xanthophyll content. After this processing it is in condition to be added directly to the feed. The ethoxyquin extends the life of the marigold meal since the shelf life of the product depends upon storage conditions such as temperature, light, and moisture. The product, according to the witness, is sold only to people in the poultry industry.

Mr. Perry F. Twining, consulting poultry nutritionist, employed by Research and Consulting Associates, Inc., testified on behalf of plaintiff. Mr. Twining's experience in poultry feed and nutrition dates back to 1949 when he was employed as a poultry specialist by the University of Maryland. The witness' duty as a consultant include the responsibility for the nutritional program of a poultry company and the evaluations of components and drugs.

Witness Twining testified he was familiar with marigold meal and its relationship to poultry feed. The pigmentation of the skin of a chicken and the color of the yolk of an egg is a significant factor of marketing in various parts of the United States. In the New England States, Maryland, Delaware, and Virginia, there is a preference for pigmented chickens. The geographical preference for pigmented or nonpigmented poultry developed historically. In South Carolina, Georgia, Florida, Alabama, Mississippi, Arkansas, and Texas, little attention is given to the pigmentation of poultry.

Mr. Twining has conducted tests in evaluating the availability of xanthophyll from various sources. Xanthophyll is a naturally occurring chemical which acts as a pigment in certain vegetables as well as in the tissue of the bird and the yolks of the eggs. Marigold meal is formulated into poultry feed by use of a computer, the amount of which varies from one-half pound to 3 pounds per ton of feed. According to the witness, marigold meal is used only for coloring the tissue of the chicken and the yolks of eggs. Other commercial substances which contain xanthophyll are corn, gluten meal, grasses, alfalfa, leaf meal, blue grass, and Bermuda grass. Historically, chickens received their yellow color from grass and corn found while wandering around the barnyard. Corn is still used as a source of xanthophyll but also fulfills some of the chicken's nutritional needs. Marigold meal has no value other than its xanthophyll content.

The pigment of xanthophyll is a fat soluble compound and is associated with the absorption of fats. It is transported to the tissue

of the poultry and the yolks of the eggs with the fats that are in the feed. The feed, therefore, acts as a vehicle by which the xanthophyll is transmitted to the poultry.

Plaintiff's final witness was Mr. Hobart R. Halloran, president of Halloran Research Farm, Inc., whose business deals with poultry nutrition and feed. His duties as a poultry nutritionist are to formulate feeds and feeding schedules which are economical and which produce the best possible poultry. Witness Halloran is familiar with marigold meal and testified that its most important constituent was its xanthophyll content. Mr. Halloran explained that xanthophyll was also a pigment which is absorbed intact by the chicken and transported in the blood stream to the fatty tissue of the skin and to the yolks of the eggs. The consumer demand for pigmented chickens necessitates the use of marigold meal, particularly in California where the demand is for a highly pigmented chicken. The only reason marigold meal is added to the poultry feed is to impart color to the chicken and the yolks of eggs. Mr. Halloran recommends the use of marigold meal only when there is a pigmentation requirement and when it economically fits into the formula. To his knowledge, there is no other use for marigold meal.

With the use of ethoxyquin, the oxidation of xanthophyll is not a commercial problem since it has a loss of 10 percent a year under good storage conditions. Without ethoxyquin, there is a loss of 20 to 25 percent per year.

Mr. Halloran testified in rebuttal that the Roche yolk color fan shown on page 21 of exhibit 4 is used to evaluate yolk color and body color of broilers as a standard reference. To his knowledge the color index is not used as a guide by the poultry industry.

Defendant called Mr. George M. Swartswalder, an employee of Allied Chemical Corp. The witness received a bachelor of science degree in chemical engineering and for 9 years was assistant production manager of a firm producing synthetic dyestuffs. The witness was employed by General Foods for 5 years studying certified food colors. For the past 12 years he has been employed by Allied Chemical Corp. in a variety of positions. Since 1968, the witness has been on the editorial committee of the internationally recognized Color Index which is used by every major government and the coloring trade in the United States as a means of identifying commercially available dyes, pigments, and natural colorants. The people who use natural and synthetic dyestuffs and colors consider the term "coloring" to mean the external application of color.

According to the witness, the Color Index, while listing two natural yellow colors, does not include xanthophyll nor has it ever been petitioned to have it listed as a commercial colorant. No product which must be ingested to produce a color is listed in the Color Index. Xantho-

phyll, according to the witness, is not used to dye fabrics, wood, or paper.

Mr. Swartswalder was aware of the Roche color fan and believed it was a standard used in measuring the color of the yolk of an egg.

The record satisfactorily establishes the imported marigold meal is used as an ingredient of poultry feed for the sole purpose of imparting a yellow color to the skin of the chicken and the yokes of the eggs. Basically, marigold meal has no nutritional value and is mixed with the feed on a basis of one-half to 3 pounds to 1 ton of poultry feed.

In the absence of headnote 1(a) of schedule 1, part 15, subpart C of the Tariff Schedules of the United States, the marigold meal would fall within the provision as classified. However, said headnote excludes products provided for in schedule 4 (except part 2E) or schedule 5 (except part 1K). Plaintiff's claim is under schedule 4, part 9; hence, if the claimed provision is applicable to the merchandise at bar, it would not be dutiable under the provision utilized for classification. The intent of Congress in enacting the modification of headnote 1(a) of schedule 1, part 15, subpart C, is referred to in Senate Report No. 530 (at pp. 11–12), and the Conference Report No. 979 (at p. 12). This exclusionary language was not initially in the Tariff Schedules of the United States, but was added by Public Law 89–241 (1965). The reports point out the amendment is designed to insure that articles described in the chemical and nonmetallic mineral schedules are not to be dutiable as animal feed. The sole judicial interpretation of said headnote 1(a) insofar as research reveals is the case of *Enrique Garza* v. *United States*, 66 Cust. Ct. 212, C.D. 4192 (1971), which held that plaintiff's burden is limited to establishing that the imported merchandise comes within the scope of the provision claimed.

In order to come within the scope of item 470.80, *supra*, plaintiff must establish the marigold meal to be:

1. a product of vegetable origin;
2. chiefly used for coloring or tanning; or
3. crude or processed within headnote 2(a) of schedule 4, part 9, subpart A.

The court can readily dispose of the first portion of proof inasmuch as it appears not to be disputed that the marigold meal is of vegetable origin. The record establishes and defendant's answer admits the marigold meal to be of vegetable origin.

There is the further question of whether the pigmentation of the skin of the chicken and the yolks of the eggs falls within the language, "suitable for coloring (including dyeing and staining)."

Plaintiff contends the marigold meal falls within the language since the chief and only use is for the purpose of coloring the tissue or skin of chickens and the yolks of their eggs. Additionally, plaintiff contends

the end result of the addition of marigold meal to the poultry feed falls within the dictionary definition of coloring. The statutory language, plaintiff contends, does not limit the meaning of coloring to external application. It is further contended that the Food and Drug Administration classifies marigold meal as a color additive.

Defendant on the other hand takes the position that marigold meal is not chiefly used for coloring within the meaning of either item 470.80 or item 470.85 of the Tariff Schedules of the United States since coloring must be applied externally and not by ingestion. This, defendant contends, is supported by the legislative history and the dictionary definition. It is urged by defendant that all of the articles provided for in schedule 4, part 9, subpart A are dye and tanning products. Since marigold meal is a substitute for other feed products which supply xanthophyll, defendant contends it was not the intent of Congress to include the imported merchandise in either item 470.80 or item 470.85. The testimony of defendant's witness that marigold meal is not listed in the color index, which is an internationally recognized reference in the coloring industry, is additional reason for excluding the imported merchandise from the claimed classification.

There appears to be no question that marigold meal falls within the literal meaning of the provision for "Products of vegetable origin used chiefly for coloring or tanning." The common meaning of a tariff term applies in the absence of a contrary intent or a commercial meaning which differs from the common meaning. *Trans-Atlantic Company* v. *United States*, 60 CCPA 100, C.A.D. 1088, 471 F. 2d 1397 (1973). The common meaning of a tariff term is a question of law to be decided by the court. *United States* v. *National Carloading Corp. et al.*, 48 CCPA 70, C.A.D. 767 (1961). The courts may consult dictionaries and other reliable sources to aid their judicial knowledge.

"Webster's Third International Dictionary" (1963) defines coloring as follows:

> Coloring 1a: The act of applying colorants: the application of color; or
> Coloring b: Something that produces color or color effects.

This definition in and of itself would appear to encompass the marigold meal involved herein. However, in addition to the definition, the court notes that headnote 1 of subpart A provides as follows:

> 1. This subpart covers only materials, extracts, decoctions, and other preparations suitable for coloring (including dyeing and staining) or for tanning. All the products provided for are of vegetable origin except cochineal (item 470.05) which is of animal origin.

The words in parentheses, "including dyeing and staining," are not words of limitation, but words of extension. *Heemsoth & Basse et al.* v. *United States*, 24 CCPA 208, T.D. 48657 (1936); *Semon Bache & Company* v. *United States*, 47 Cust. Ct. 31, C.D. 2275 (1961).

Congress therefore intended to include in the term "coloring" more than dyeing and staining. Accordingly, items 470.80 and 470.85 include products that are used for coloring which may not be dyes or stains. This is further evidenced by the headnote of schedule 1, part 15, subpart C, which exempts schedule 4 (except part 2E) and schedule 5 (except part 1K). Part 2E covers chemical mixtures and part 1K covers nonmetallic minerals and products, not specially provided for. If Congress had intended to exclude part 9, subpart A of schedule 4, it could have been readily accomplished by so providing in the head note to schedule 1.

Where the statutory language is clear and unambiguous, resort to legislative history is unnecessary. In any event, it must be borne in mind the evidence establishes the imported marigold meal was not utilized according to Mr. Spaul prior to 1968, or the mid-1960's according to Mr. Twining. Hence the material presented to Congress in the Tariff Classification Study and the supplemental reports in the years 1960–63 would not be determinative. However, since tariff acts are written for the future as well as the present, it is well recognized that tariff terms will embrace merchandise not known to commerce at the time of the enactment. *Sears, Roebuck and Co.* v. *United States*, 46 CCPA 79, C.A.D. 701 (1959).

An excerpt of the FDA regulation in 21 CFR 70.3(f), while not determinative is certainly enlightening. Said provision defining "color additive" reads in part as follows:

> * * * An ingredient of an animal feed whose intended function is to impart, through the biological processes of the animal, a color to the meat, milk, or eggs of the animal is a color additive and is not exempt from the requirements of the statute. This definition shall apply whether or not such ingredient has nutritive or other functions in addition to the property of imparting color. * * *

The court is aware that what is termed a color additive by one agency under a different statutory scheme is not controlling under customs law. It is in any event inconsistent with defendant's position that color must be externally applied and may not be ingested to obtain the results of coloring.

Plaintiff has established the marigold meal to fall within the provision for products of vegetable origin used chiefly for coloring.

The final issue for determination is whether the marigold meal falls within headnote 2(a) as "crude or processed" (item 470.80), or within the "other" provision (item 470.85).

Dr. Javier Loustaunau, director of research and development of the shipper, testified as to the processing of the marigold meal as follows:

> Q. And would you tell us the process used by Produmex from the time the marigold flowers are harvested to the time the product is exported to the United States on a step by step basis?

A. The marigolds are picked by hand. I don't know if all of you are familiar with the marigold flower, cut from the bottom of the calyx by hand and transported to a plant in trucks and then it is loaded into some feeders, continuous feeders, if you are familiar with the highrise, one of these feeders, it pushes the flower and, at the end of the feeder, we have a cutter. It is what we name it. We improvise it from the cylindrical cutters of the combine machines.

Q. What happens when it gets to the cutter?
A. Imagine it's a cylinder with another cylinder inside. The inside has blades and the flower goes into there, and the calyx, the solid part, goes in between the blades and the cylinder and that separates the petals from the calyx and the seeds.

Q. After it's cut, what happens to the marigold flowers?
A. After this, it goes into the rest of the processing. We have changed this processing through the years. At the present time, we are gathering the flowers——

Q. With the marigold meal at issue here, were the flowers that produced it—were they blanched, as well?
A. No, sir. This has been added since this year.

Since headnote 2(a) defines crude or processed, it is not necessary for the court to review the numerous cases cited by the parties as to what constitutes crude. The processes described above, the cutting and grinding, as well as the drying to reduce bulk and moisture, are well within the headnote.

The addition of ethoxyquin to prevent the oxidation of its xanthophyll does not, in the opinion of the court, constitute processing. The addition of said product is to prevent the loss of the xanthophyll content which is the basis of sale. Accordingly, none of the processes or the addition of the ethoxyquin would remove the marigold meal from the provision of item 470.80 as claimed.

Judgment will be entered accordingly.